No. 23-10332

# United States Court of Appeals for the Eleventh Circuit

---

REV. STEPHEN JARRARD,

*Plaintiff-Appellant*

v.

SHERIFF OF POLK COUNTY, ET AL.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Georgia
No. 4:20-cv-00002-MLB

---

## APPELLANT'S OPENING BRIEF

---

Zack Greenamyre
MITCHELL SHAPIRO GREENAMYRE &
 FUNT, LLP
3490 Piedmont Rd., Ste. 650
Atlanta, GA 30305
(404) 812-4747

W. Gerald Weber
LAW OFFICES OF GERRY WEBER, LLC
P.O. Box 5391
Atlanta, GA 31107
(404) 522-0507

John A. Meiser
Meredith Holland Kessler
NOTRE DAME LAW SCHOOL
 RELIGIOUS LIBERTY CLINIC
1338 Biolchini Hall
Notre Dame, IN 46556
(574) 631-3880

*Counsel for Plaintiff-Appellant Stephen Jarrard*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-2, the following persons and entities may have an interest in the outcome of this case:

1.  Association of County Commissioners of Georgia ("ACCG") (insurer for Defendants and Appellees);

2.  Barclay, Stephanie (counsel for Plaintiff-Appellant);

3.  Greenamyre, Zack (counsel for Plaintiffs and Appellant);

4.  Jarrard, Stephen (Plaintiff-Appellant);

5.  Kessler, Meredith (counsel for Plaintiff-Appellant);

6.  Law Offices of Gerry Weber, LLC (law firm of counsel for Plaintiffs and Appellant);

7.  Meiser, John (counsel for Plaintiff-Appellant);

8.  Mitchell, Shapiro, Greenamyre & Funt LLP (law firm of counsel for Plaintiffs and Appellant);

9.  Moats, Johnny (Defendant-Appellee);

10. Morris, Ollie "Mitchell" (Plaintiff);

11. Notre Dame Law School Religious Liberty Clinic (counsel for Plaintiff-Appellant);

12. Polk County, Georgia (potential indemnitor of Defendants and Appellees);

13. Polk County Sheriff's Office (employer and potential indemnitor of Defendants and Appellees);

14. Sharp, Al (Defendant-Appellee);

15. Stroup, Dustin (Defendant);

No. 23-10332
*Jarrard v. Sheriff of Polk County, et al.*

_____

16.    The Honorable Michael L. Brown (United States District Court Judge);

17.    Waymire, Jason (counsel for Defendants and Appellees);

18.    Weber, Gerald (counsel for Plaintiffs and Appellant);

19.    Williams, Terry (counsel for Defendants and Appellees);

20.    Williams, Morris & Waymire, LLC (law firm of counsel for Defendants and Appellees).

Undersigned counsel is aware of no publicly traded company or corporation with an interest in the outcome of this case.


/s/ *John A. Meiser*
John A. Meiser
*Counsel for Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument because it would significantly aid this Court's decisional process.  Fed. R. App. P. 34(a)(2)(C); 11th Cir. R. 34-3(c).  Oral argument would allow counsel to clarify the facts and legal arguments asserted in this brief.

# TABLE OF CONTENTS

CIP AND CORPORATE DISCLOSURE STATEMENT ....................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF CONTENTS.......................................................................................... ii

TABLE OF CITATIONS ....................................................................................... iv

STATEMENT OF JURISDICTION........................................................................ ix

STATEMENT OF THE ISSUES..............................................................................1

STATEMENT OF THE CASE.................................................................................2

   A.  Jarrard's Religious Ministry in Georgia Jails and Prisons .............................2

   B.  Jarrard's First Expulsion from Polk County Jail..............................................3

   C.  The Jail's Baptism Ban and Second Exclusion of Jarrard ..............................4

   D.  Jarrard's Lawsuit and the County's Shifting Policies ....................................7

   E.  Order Granting Summary Judgment ................................................................9

   F.  Appeal and Standard of Review....................................................................12

SUMMARY OF THE ARGUMENT .....................................................................13

ARGUMENT ........................................................................................................15

I.  County officials may not retaliate against Jarrard simply because they disagree with his religious teachings—whether he is treated as a "government employee" for the purposes of this claim or not. ...................15

   A.  The First Amendment bars County officials from suppressing disfavored religious beliefs within the volunteer ministry program.........................16

   B.  The suppression of Jarrard's religious expression is not justified on the theory that he should be treated as a "government employee" under *Pickering*. ................................................................................................20

C. Even if *Pickering* applied, Jarrard's religious expression is protected by the First Amendment. ...............................................................27

   1. Jarrard's ministry satisfies *Pickering*'s "threshold inquiry" into constitutionally protected expression. ...................................27

      a. Free exercise claims are not subject to *Pickering*'s threshold inquiry. .........................................................28

      b. In ministering to inmates based on his religious beliefs, Jarrard spoke for himself as a citizen. ...........................30

      c. Jarrard's expression and exercise of his religious beliefs about salvation are core matters of "public concern." ...................33

   2. The balance of interests weighs heavily in Jarrard's favor. ............... 38

II. Qualified immunity does not bar Jarrard's retaliation claim. ......................41

   A. Qualified immunity does not apply to Jarrard's request for injunctive relief. ...................................................................41

   B. Qualified immunity does not shield the officers' retaliation against Jarrard because he expressed disfavored religious beliefs. ....................42

III. The district court erred in rejecting Jarrard's claims against the unbridled discretion given to officials to admit or deny ministers. ...............................46

   A. The policies lacked any standard to guide whom Jail officials would allow to participate in the ministry program. ..........................................47

   B. Qualified immunity does not shield the policies' obvious failure to specify constitutionally required standards. ...........................................50

CONCLUSION ........................................................................................53

CERTIFICATE OF COMPLIANCE .......................................................54

CERTIFICATE OF SERVICE ...............................................................55

iii

# TABLE OF CITATIONS

## Cases

*Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011)..............35

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205 (2013) .......... 17, 44

*Alves v. Bd. of Regents of the Univ. Sys. of Ga.*,
  804 F.3d 1149 (11th Cir. 2015)............................................................................27

*Andersen v. McCotter*, 100 F.3d 723 (10th Cir. 1996).............................................17

*Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*,
  322 F.3d 1298 (11th Cir. 2003) ............................................................................50

*\*Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017) ............ *passim*

*Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996)................................... 22, 23

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ...............................................43

*Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004)...............................................52

*Brannon v. Finkelstein*, 754 F.3d 1269 (11th Cir. 2014)........................................15

*Brown v. Polk County*, 61 F.3d 650 (8th Cir. 1995)......................................... 34, 35

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*,
  942 F.3d 1215 (11th Cir. 2019) ............................................................. 18, 32, 48

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
  451 F.3d 1257 (11th Cir. 2006)............................................................................25

*Capitol Square Rev. and Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) .................17

*CarePartners, LLC v. Lashway*, 545 F.3d 867 (9th Cir. 2008)........................ 23, 24

*Carollo v. Boria*, 833 F.3d 1322 (11th Cir. 2016)........................................... 51, 52

*Carson v. Makin*, 142 S. Ct. 1987 (2022)................................................................44

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) .............. 47, 49

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*,
   457 F.3d 376 (4th Cir. 2006) .................................................................51

*Coffin v. Brandau*, 642 F.3d 999 (11th Cir. 2011)...................................43

*Connick v. Myers*, 461 U.S. 138 (1983)........................................... *passim*

*Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313 (11th Cir. 2005) ......... 37, 39, 44

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) ..........20

*Daniels v. City of Arlington*, 246 F.3d 500 (5th Cir. 2001)....................................36

*D.H. ex rel. Dawson v. Clayton Cnty. Sch. Dist.*,
   830 F.3d 1306 (11th Cir. 2016) ...........................................................42

*Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012)...............................12

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015)........................29

*Eichenlaub v. Twp. of Indiana*, 385 F.3d 274 (3d Cir. 2004).................................26

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)...................................19

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................27

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001)...................................44

*Grigley v. City of Atlanta*, 136 F.3d 752 (11th Cir. 1998)......................................34

*Gundy v. City of Jacksonville*, 50 F.4th 60 (11th Cir. 2022) ..................................33

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004)..............43

*Hubbard v. Clayton Cnty. Sch. Dist.*, 756 F.3d 1264 (11th Cir. 2014) ..................30

*Hyland v. Wonder*, 972 F.2d 1129 (9th Cir. 1992) ................................................17

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992)........ 19, 48

*Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011)......................35

*Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010).........................................52

*Keister v. Bell*, 29 F.4th 1239 (11th Cir. 2022) .......................................................25

*\*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ............................. *passim*

*King v. Bd. of Cnty. Comm'rs*, 916 F.3d 1339 (11th Cir. 2019)...................... 34, 37

*Larson v. Valente*, 456 U.S. 228 (1982) ...................................................... 24, 31, 45

*Marie v. Am. Red Cross*, 771 F.3d 344 (6th Cir. 2014)..........................................26

*Matal v. Tam*, 582 U.S. 218 (2017) ........................................................................32

*Mayfield v. City of Oakland*, 2007 WL 2261555 (N.D. Cal. Aug. 6, 2007) ...........23

*McKinley v. Kaplan*, 262 F.3d 1146 (11th Cir. 2001) ...................................... 22, 24

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ....................................... 29, 34

*Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276 (11th Cir. 2006) ...........................34

*Mosely v. Bd. of Educ. of Chi.*, 434 F.3d 527 (7th Cir. 2006) ................................17

*Mustapha v. Monken*, 2013 WL 3224440 (N.D. Ill. June 25, 2013).......................23

*Nat'l Treasury Emps. Union v. United States*,
   990 F.2d 1271 (D.C. Cir. 1993).................................................................. 34, 38

*O'Laughlin v. Palm Beach County*, 30 F.4th 1045 (11th Cir. 2022).......................37

*Pearson v. Callahan*, 555 U.S. 223 (2009).............................................................42

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ..............19

*Perry v. Sindermann*, 408 U.S. 593 (1972) ............................................................17

*Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904 (11th Cir. 1993) ............................35

*\*Pickering v. Board of Educ. Twp. High Sch. Dist. 205*,
   391 U.S. 563 (1968) ...................................................................................... *passim*

*Rankin v. McPherson*, 483 U.S. 378 (1987) ..................................................... 36, 38

*Richmond v. Badia*, 47 F.4th 1172 (11th Cir. 2022)...................................................51

*Rodin v. City of Coral Springs, Fla.*, 229 F. App'x 849 (11th Cir. 2007)...............22

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995)....... 18, 19

*Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250 (6th Cir. 2006) .............35

*Searcey v. Crim*, 815 F.2d 1389 (11th Cir. 1987)........................................... 19, 20

*Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189 (11th Cir. 1991)................... 46, 50

*Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022) ....................................................32

*Smith v. LePage*, 834 F.3d 1285 (11th Cir. 2016) ....................................................43

*Sutton v. Wal-Mart Stores East, LP*, 64 F.4th 1166 (11th Cir. 2023) ....................12

*Texas v. Johnson*, 491 U.S. 397 (1989) ........................................................... 16, 43

*T.R. ex rel. Brock v. Lamar Cnty. Bd. of Educ.*,
    25 F.4th 877 (11th Cir. 2022)................................................................................42

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995)............... 33, 34

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........................... 16, 43

*Walden v. Ctrs. for Disease Control & Prevention*,
    669 F.3d 1277 (11th Cir. 2012)............................................................................29

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ................................................................................... 48, 51

*Watts v. Fla. Int'l Univ.*, 495 F.3d 1289 (11th Cir. 2007)........................................28

**Statutes**

28 U.S.C. § 1291 ................................................................. ix

28 U.S.C. § 1331 ................................................................. ix

**Rules**

Fed. R. Civ. P. 56 .............................................................12

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this action arises under the First and Fourteenth Amendments of the U.S. Constitution.

This Court has jurisdiction under 28 U.S.C. § 1291 for the reasons stated in the Parties' Joint Response to Jurisdictional Questions to this Court. *See* Joint Response to Jurisdictional Questions (Mar. 3, 2023); Notice of Probable Jurisdiction (Apr. 6, 2023). This appeal was originally docketed after Stephen Jarrard filed a timely notice of appeal on January 27, 2023, within 30 days after entry of the court's Second Amended Judgment, which dismissed all of Jarrard's claims. Docs. 84, 85.[1] Jarrard filed an amended notice of appeal on March 3, 2023, within 30 days after the district court entered an order formally dismissing all of former Plaintiff Ollie Morris's claims and rendering final judgment in the case. Docs. 89, 92.

---

[1] Citations to "Doc." refer to documents as numbered on the district court docket.

## STATEMENT OF THE ISSUES

(1) Whether the retaliatory exclusion of a religious minister from Polk County Jail's volunteer ministry program—based on County officials' personal disagreement with his religious teachings, including his interpretation of the Bible and his teachings on baptism—violates the Free Speech and Free Exercise Clauses of the First Amendment.

(2) Whether jail policies giving officials unbridled discretion to determine which individuals may participate in the volunteer ministry program violate the First and Fourteenth Amendments.

(3) Whether the defendants are entitled to qualified immunity on either claim.

## STATEMENT OF THE CASE

This case arises from a longstanding disagreement over the theology of baptism between Reverend Stephen Jarrard, an Evangelist of the Church of Christ, and officials of Polk County, Georgia. Specifically, Johnny Moats, the Sheriff of Polk County, and Al Sharp, the former Chief Jailer of Polk County Jail, for years denied Jarrard the opportunity to participate in the Jail's volunteer ministry program because they personally reject his views on baptism.

### A.    Jarrard's Religious Ministry in Georgia Jails and Prisons

Jarrard has served as a volunteer minister at jail and prison facilities in Georgia for nearly 20 years. Doc. 53 ¶ 9; Doc. 60 at 16–17.[2] Through his ministry, Jarrard "shar[es] . . . God's word and the Gospel" with prisoners by engaging them in discussions about the Bible. Doc. 60 at 17, 30–32. Jarrard believes it is his religious duty to "get as many folks baptized into Christ as [he] can before Jesus returns." Doc. 60-4 at 3. That is because, as a member of the Church of Christ, Jarrard believes that baptism into Christ is necessary for salvation and, unless baptized, a person will be condemned to an afterlife in Hell. Doc. 60 at 145–46. He believes that baptism must be performed by full immersion. Doc. 60 at 146–47.

---

[2] Record references are to the page numbers in the header generated by the district court's electronic filing system. 11th Cir. R. 28-5.

Moats and Sharp have repeatedly made clear that they disagree with Jarrard's views on these subjects and oppose his efforts to share those views with inmates in Polk County Jail.

**B.    Jarrard's First Expulsion from Polk County Jail**

Around 2012, Jarrard began sharing his beliefs with inmates at Polk County Jail as a participant in its volunteer ministry program.  Doc. 60 at 107; Doc. 60-4 at 1.  Through that program, the "Polk County Sheriff's Office encourages Clergy from the community to minister to the inmates" by "hold[ing] services or conducting programs in the jail" to "facilitate the free exercise of religious beliefs" by interested inmates.  Doc. 53-5 at 1, 3.  The program is open broadly to individuals of all faiths.  Doc. 53-5.  At the time Jarrard first began ministering there, interested volunteers needed only to "come up and ask and put their name on [a] list," and at one point the list included more than 140 volunteers.  Doc. 62 at 34.  Jarrard testified that, when he first began, his request to participate was approved within minutes.  Doc. 60 at 107.

After Jarrard had been ministering to inmates in Polk County Jail for several months, another volunteer—a Baptist, with views about salvation contrary to Jarrard's—confronted Jarrard during a ministry session and demanded that he stop teaching inmates that they must be baptized to be saved.  Doc. 53 ¶¶ 31–32; Doc. 60 at 36–37; Doc. 60-4 at 1.  Unfortunately for Jarrard, the Polk County Sheriff's Office

soon made clear that it disagreed with his views as well.  Soon after this incident, the "head" of the Jail's volunteer ministry team informed Jarrard that he could continue visiting Polk County Jail only if he stopped teaching about baptism.  Doc. 53 ¶ 31; Doc. 60 at 37; Doc. 60-4 at 1.  Jarrard, however, refused to deny his beliefs about salvation or to "stop talking about baptism."  Doc. 60 at 37.

The following week, Jarrard was ejected from the volunteer ministry program for his refusal to alter his teachings on baptism.  Doc. 53 ¶ 31; Doc. 60 at 37–38.  He sought unsuccessfully to resolve the conflict with the Sheriff's Office, under both the sheriff at the time of the confrontation and Johnny Moats once he took office following his election in 2012.  Doc. 53 ¶ 31; Doc. 60 at 37–40.  Jarrard was held out of the Jail for roughly two years.  Doc. 53 ¶ 31; Doc. 60 at 39–40.

### C.    The Jail's Baptism Ban and Second Exclusion of Jarrard

On December 31, 2014, the Jail permitted Jarrard to return and he continued his ministry without further incident for about a year.  Doc. 53 ¶¶ 31–33; Doc. 60 at 40–41; Doc. 70 ¶ 32.  During this time, he performed multiple full-immersion baptisms at the Jail.  Doc. 53 at ¶¶ 11–14; Doc. 60 at 53–56; Doc. 61 at 32.

But Jarrard's reentry to the Jail was short-lived, as the Sheriff's Office soon cracked down on his teachings about baptism once again.  In February 2016, faced with additional requests by inmates for baptisms, Doc. 60 at 63–64; Doc. 61 at 32,

Moats and Chief Jailer Al Sharp[3] adopted Polk County Jail Order Number 7.07 (2/1/2016) ("the First Policy"), which governed inmates' religious exercise, the volunteer ministry program, and the availability of religious services in the Jail. Doc. 53-2; Doc. 62 at 24–28. Among other things, the policy banned all "[r]eligious rituals such as baptism and wedding ceremonies . . . for inmates, as [the] Jail is a short term facility." Doc. 53-2 at 4. Both Moats and Sharp also made clear that they personally opposed Jarrard's views on baptism, believing instead that the true path to salvation is through faith in Jesus Christ alone. Doc. 75 at 11. Indeed, Sharp told inmates that the Jail banned baptism specifically because it was not necessary for their salvation. Doc. 53 ¶ 31; Doc. 60 at 64–65; *see also* Doc. 75 at 16 (jury could find that Moats and Sharp banned baptism "based solely on their own religious view that baptism is unnecessary").

Moats and Sharp also suspended the ministry program while they established these new rules. Doc. 60 at 47; Doc. 62 at 34–35. They told Jarrard that he specifically would not be permitted to minister to inmates unless he stopped teaching that baptism was necessary for salvation. Doc. 53 at ¶ 33; Doc. 60 at 63. Regardless, Jarrard completed a required one-evening training class on the new policies, Doc.

---

[3] Sharp was the Chief Jailer during the relevant time period from August 2015 through February 2021. Doc. 62 at 7.

60 at 63, and in January 2017 applied to resume his ministry, Doc. 60-13. The Jail denied his application. Doc. 60 at 66.

For months after his application was denied, Jarrard held a vigil outside the Jail to protest the Jail's decision, displaying posters and distributing handouts about his ministry several days a week. Doc. 60 at 71–73. When they saw Jarrard at his vigil, Moats and Sharp would regularly engage with him to dispute his views on baptism. Doc. 60 at 74–75. Jarrard also wrote jail officials several letters objecting to his exclusion, including a demand letter submitted through counsel in April 2019. Doc. 53 ¶¶ 32, 66.

In May 2019, Moats—"under the specter of litigation"—responded to Jarrard's counsel and explained "*in writing* . . . that he banned inmate baptism based on [Moats's] own religious views." Doc. 75 at 11. On "the baptism issue," Moats explained:

> The Bible sets forth what a person must do to receive salvation, not any church denomination nor the court. "If you declare with your mouth, Jesus is Lord, and believe in your heart that God raised Him from the dead, you will be saved" (Romans 10:9). Baptism is not mentioned here as a requirement to salvation. "He who believes and is baptized will be saved; but he who does not believe will be condemned" (Mark 16:16). In the case of baptism and salvation, the Bible is clear that salvation is by grace through faith in Jesus Christ, not by works of any kind, including baptism (Ephesians 2:8-9). *Our stance is since the Polk County Jail is a short term detention center, baptism can wait until after release since it is not a requirement for salvation.*

6

Doc. 61-2 at 1–2 (emphasis added).  Moats's letter also complained that Jarrard's minority religious beliefs "caus[ed] doubt and confusion" among the inmates and that Jarrard's beliefs about the end times were "contrary to the teaching of the Bible" and suggest "mental health issues" rather than religious truth.  Doc. 61-2 at 1.

### D.   Jarrard's Lawsuit and the County's Shifting Policies

In January 2020, Jarrard and Ollie Morris, a former inmate whose request for baptism had been denied, filed suit against Moats, Sharp, and Dustin Stroup,[4] a jailer, for declaratory, injunctive, and monetary relief.  Doc. 1.  Jarrard claimed that the Jail officials had unconstitutionally retaliated against him for exercising his First Amendment rights by excluding him from the volunteer ministry program based on their disagreement with his teachings on baptism and his efforts to perform baptisms for inmates in the Jail.  Doc. 1 ¶¶ 50–54.  Jarrard and Morris also alleged that the Jail's baptism ban violated the First Amendment.  Doc. 1 ¶¶ 46–49.

Soon thereafter, Moats and Sharp amended the Jail's religious-services policy. Under the revised policy, Policy Number 5.23 (3/12/2020) ("Second Policy"), the Jail required "[c]lergymen and religious advisors wishing to hold services or conduct programs in the jail [to] make written application to the Polk County Sheriff's Office with supporting documentation, attend a training session and then be approved by

---

[4] Jarrard does not appeal as to Defendant Stroup.

7

the Jail Administrator." Doc. 53-4 at 2; Doc. 70 ¶ 41. The revised policy did not

identify any requirements for the application or other qualifications for approval.

Doc. 53-4. Although this Second Policy also addressed requirements for religious

services, it no longer banned religious rituals. Doc. 53-4. Jarrard submitted another

application to resume his volunteer ministry under the new policy, which was again

denied. Doc. 53-8; Doc. 53-9.

After Jarrard filed an amended complaint to address the denial of his

application under the Second Policy, Moats and Sharp implemented a third policy

on religious services in August 2020, revised Order Number 7.07 (8/17/2020)

("Third Policy"). Doc. 16; Doc. 53-5. The Third Policy reinstated the ban on

religious rituals, including baptism. Doc. 53-5 at 3. The policy also provided that

"[c]lergymen and religious advisors wishing to hold services or conduct programs

in the jail must submit a volunteer application" and must "complete background

checks, including the jail ministry program" to be "allowed within the inner security

perimeter or allowed contact visitation." Doc. 53-5 at 3. Jarrard again applied to

participate in the program under this policy but was denied. Doc. 53-10; Doc. 69-1.

In October 2021, Jarrard again amended his complaint to address the latest

policy and ministry application.[5] Doc. 53. In this Second Amended Complaint,

---

[5] Jarrard also amended his complaint to reflect the dismissal of his challenge
to the baptism ban on standing and other grounds. Doc. 53 at 2 n.1; Doc. 34 at 22.
Jarrard does not challenge that dismissal here.

Jarrard additionally alleged that the Second and Third Policies failed to provide sufficient standards to restrain Jail officials' discretion in approving or denying applications to participate in the ministry program, in violation of the First Amendment.[6]  Doc. 53 ¶¶ 87–91.

### E.    Order Granting Summary Judgment

After discovery, the parties filed cross-motions for summary judgment. Jarrard moved for partial summary judgment on his claim against the unbridled discretion given to officials under the Second and Third Policies.  Doc. 56 at 2.  The Jail officials moved for summary judgment on all claims.  Doc. 57;  Doc. 58.

Following these motions, the Sheriff's Office adopted a *fourth*—the current— policy on religious services, revised Order Number 7.07 (3/23/2022) ("Fourth Policy").  Doc. 68-1.  This Fourth Policy specifies reasons for which "[i]ndividuals may be denied authorization to participate in the jail ministry program."  Doc. 68-1 at 3.  Moreover, the Fourth Policy requires the Jail to review applications "on a first-come, first-serve basis" and to respond within 30 days.  Doc. 68-1 at 4.  Given these changes, Jarrard withdrew his request for injunctive relief on his claims against the unbridled discretion of the Second and Third Policies, but maintained his claims for

---

[6] This claim had previously been incorporated into the baptism-ban claim. Doc. 53 at 20 n.2; Doc. 34 at 44 (allowing unbridled discretion claim to proceed).

damages for having been subjected to those unconstitutional policies.  Doc. 68 at 2. Jarrard did not alter his requests for relief on the retaliation claims.

Ultimately, the district court granted in part and denied in part the cross-motions for summary judgment.  Doc. 75 at 41.  First, the court denied the defendants' motion for summary judgment on Ollie Morris's baptism-ban claim against Moats and Sharp.  "There is substantial evidence," the court found, "that Defendants Sharp and Moats banned inmate baptism and denied [Morris's] baptism request because they personally believe baptism is not necessary for salvation." Doc. 75 at 11.  The court found that a jury could "easily" conclude that Moats and Sharp's stated interest in promoting safety and security was pretextual and that their real motivations were "illegitimate interests (theology)."  Doc. 75 at 12–13. Observing that "this is one of those rare cases where Defendants' conduct violated the First Amendment as a matter of obvious clarity," the court concluded that Moats and Sharp were not entitled to qualified immunity.  Doc. 75 at 15–16 (quotation omitted).[7]

Notwithstanding these "obviously" unconstitutional motives, the court granted summary judgment to the defendants on Jarrard's First Amendment

---

[7] The court granted qualified immunity to defendant Stroup, who was found not to have been involved in creating the baptism ban and was later dismissed from the case.  Doc. 75 at 16; Doc. 84.  Likewise, Morris is no longer in the case following a settlement of his claims against Moats and Sharp.  Doc. 89.

10

retaliation claim, finding that his ministry in the Jail was not entitled to any First Amendment protection.  Doc. 75 at 32–33.  The court opined that—even though Jarrard was an unpaid and largely undirected volunteer—he effectively served as a "government employee" in the ministry program, and thus his ministry was subject to greater restriction under *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968).  Applying *Pickering*, the court concluded that Moats and Sharp were free to tell Jarrard what interpretations of the Bible he could express to inmates, as those were religious tenets that Jarrard had been "hired" to express on the County's behalf.  Doc. 75 at 24–28.  Bizarrely, the court concluded that these were the County's own messages even as it acknowledged that it would be "absurd" to believe that the County had any "legitimate government interest" in the expression of particular religious views.  Doc. 75 at 12.  The court determined that this same reasoning applied to Jarrard's claims based on his protected *speech* and *religious exercise*.  Doc. 75 at 35 n.15. The court further concluded that qualified immunity barred Jarrard's claims because the law did not clearly establish that government officials must refrain from discriminating against the religious teachings of a volunteer minister like Jarrard.  Doc. 75 at 35.

Finally, the court observed that the Second and Third Policies "arguably violated" the Constitution's demand for standards to govern officials' control over expressive activities.  Doc. 75 at 38.  But, the court concluded, the law was not

11

clearly established that such doctrine applied to—in the district court's view—a hiring procedure in a nonpublic forum.  Doc. 75 at 39–40.  Accordingly, the court awarded qualified immunity and granted summary judgment to Moats and Sharp on this claim, as well.  Doc. 75 at 41.

### F.    Appeal and Standard of Review

Jarrard timely appealed.  Doc. 85; Doc. 92.  He challenges the court's rejection of his retaliation and unbridled discretion claims on the merits and its application of qualified immunity.

This Court "review[s] a district court's decision on summary judgment *de novo*[,] . . . drawing all inferences in the light most favorable to the non-moving party and recognizing that summary judgment is appropriate only where there are no genuine issues of material fact." *Sutton v. Wal-Mart Stores East, LP*, 64 F.4th 1166, 1168 (11th Cir. 2023) (quotation omitted); *see* Fed. R. Civ. P. 56.  When "review[ing] *de novo* a district court's grant of summary judgment based on qualified immunity," the Court must "resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." *Edwards v. Shanley*, 666 F.3d 1289, 1292 (11th Cir. 2012) (quotations omitted).

## SUMMARY OF THE ARGUMENT

This is an unusual appeal.  Sheriff Johnny Moats and Chief Jailer Al Sharp all but admitted that they retaliated against Jarrard and barred him from Polk County Jail's volunteer ministry program because they disagree with his religious belief that baptism is required for salvation.  Indeed, Moats told Jarrard *in writing* that Jarrard's beliefs are "contrary to the teaching of the Bible" and that he would not be allowed to continue his ministry because the Jail's "stance" was that "baptism can wait until after release since it is not a requirement for salvation."  Doc. 61-2 at 1–2.  The district court found that a jury could "easily" conclude that Moats and Sharp's actions were "motivated by [those] illegitimate interests (theology) rather than legitimate" government concerns.  Doc. 75 at 12–13.  And yet the district court granted summary judgment *to Moats and Sharp* on Jarrard's claim for First Amendment retaliation.

As mere description of the factual background attests, Jarrard's First Amendment retaliation case should have been straightforward.  The First Amendment plainly prohibits government officials from doing what they did here: denying benefits, opportunities, or access to government facilities to a person merely because he has expressed religious views which the officials dislike.  Indeed, there is hardly any principle more central to the First Amendment.  The district court, however, erred from the first step in its analysis by twisting this claim of blatant

discrimination against Jarrard's religious beliefs into a question of the government's ability to control *its own* expression. This is not a government speech case. Jarrard was not a government employee or anything resembling one, and no relevant authorities suggest that his religious expression should be constitutionally devalued. Further, even if Jarrard *were* treated as a government employee for the purposes of this claim, a plethora of cases confirm that the First Amendment continues to protect his religious expression and exercise and that the government has no valid interest in policing the theological merits of his ministry even in the "workplace." Under any reasonable framing of this claim, Jarrard wins. The clarity of that point also rejects any suggestion that Sharp and Moats can hide behind qualified immunity to shield themselves from the damages wrought by this most blatant form of First Amendment discrimination.

Finally, prevailing law likewise makes clear that Jarrard was subjected to— and denied access to the Jail by operation of—unconstitutional policies that provided no standards to govern the selection of which citizens would be allowed to participate in the ministry program. This Court has long held that the First Amendment does not tolerate unbridled prior restraints on speech and for the very reason seen here: such policies invite officials to deny expression for impermissible reasons like their own disagreement with the speaker's message.

This Court should reverse.

# ARGUMENT

## I.     County officials may not retaliate against Jarrard simply because they disagree with his religious teachings—whether he is treated as a "government employee" for the purposes of this claim or not.

To establish a First Amendment retaliation claim, Jarrard must be able show that Moats and Sharp took adverse action against him because he engaged in constitutionally protected conduct. *Brannon v. Finkelstein*, 754 F.3d 1269, 1274 (11th Cir. 2014).  The only question at this stage is the scope of Jarrard's First Amendment rights—namely, whether his ministry within Polk County Jail was a form of expression or religious exercise that is protected by the First Amendment. The district court did not doubt that Jarrard could satisfy the other elements of his claim or that a jury could reasonably find that he had been barred from the Jail's ministry program because Moats and Sharp disagreed with his teachings on baptism. *See generally* Doc. 75.  Nor could it, given that Moats and Sharp said they were doing just that.  *See* Doc. 53 ¶¶ 32, 66; Doc. 60 at 64–65; Doc. 61-2 at 1–2.

Instead, the order granting summary judgment rested on a striking proposition of law: that the First Amendment *does not restrain* County officials from dictating to Jarrard what he can and cannot teach about salvation and the meaning of the Bible when ministering to inmates.  Doc. 75 at 32–33.  That is plainly incorrect.  County officials' discrimination against Jarrard for his religious expression is squarely prohibited by the First Amendment.  That is true whether Jarrard is viewed

15

(correctly) as a private citizen who has been denied the opportunity to minister to inmates upon their request, or even in the district court's (incorrect) view of him as a "government employee." Under any reasonable framing, summary judgment against Jarrard's First Amendment retaliation claim was improper.[8]

### A. The First Amendment bars County officials from suppressing disfavored religious beliefs within the volunteer ministry program.

The exclusion of Jarrard from the volunteer ministry program simply because he expressed disfavored religious beliefs violates perhaps the most "bedrock" principle of First Amendment law: that government officials may not suppress viewpoints with which they disagree. *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Indeed, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Government officials may neither punish a person for expressing disfavored views nor deny him access to otherwise available government benefits or

---

[8] If Jarrard's conduct is constitutionally protected, then a jury may easily conclude that he was denied a material benefit—the opportunity to continue his jail ministry—because of that conduct. *See infra* Part I.A (addressing unconstitutionality of denying government benefits and opportunities); pp. 17–18, 39–40 (addressing evidence that defendants acted because of their disagreement with Jarrard's religious expression); *see also* Doc. 34 at 38–43 (finding, at motion-to-dismiss stage, that a jury could rule in Jarrard's favor on these elements).

opportunities. *Connick v. Myers*, 461 U.S. 138, 144 (1983). The government may not deny a benefit on these grounds "even if [the person] has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 214 (2013) (quotation omitted); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[E]ven though the government may deny [a] benefit for any number of reasons, . . . [i]t may not deny a benefit to a person on a basis that infringes . . . his interest in freedom of speech."). This includes denial of "the opportunity to serve as a volunteer" in a government program. *Hyland v. Wonder*, 972 F.2d 1129, 1135 (9th Cir. 1992); *accord Mosely v. Bd. of Educ. of Chi.*, 434 F.3d 527, 534–35 (7th Cir. 2006); *Andersen v. McCotter*, 100 F.3d 723, 727 (10th Cir. 1996). And these rights are "doubly protect[ed]" for individuals, like Jarrard, who engage in *religious* expression. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (Free Exercise and Free Speech Clauses "work in tandem" to give "overlapping protection for expressive religious activities"). The Constitution was designed, in particular, to guard against centuries of "government suppression of speech" that had "been directed *precisely* at religious speech." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

One strains to imagine a clearer example of the "particular evil" of viewpoint discrimination than this case. *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1226 (11th Cir. 2017). Moats and Sharp have made it abundantly clear that they

oppose Jarrard's teachings about baptism. *See* Doc. 61 at 29–30; Doc. 62 at 12–13; Doc. 73-1 ¶ 25; Doc. 75 at 11. Moats told Jarrard *in writing* that Jarrard's beliefs are "contrary to the teaching of the Bible," and that the Jail's official "stance [was] . . . [that] baptism can wait until after release since it is not a requirement for salvation." Doc. 61-2 at 1–2. Dismayed that inmates began sharing Jarrard's beliefs, Moats got his preferred "chaplain to come down there to let [the inmates] know that . . . the Bible is interpreted in different ways and . . . just because [Jarrard] told you this doesn't make it right" and that "if you accepted Christ . . . you don't have to be baptized." Doc. 61 at 35–36. Sharp did similar, Doc. 60 at 64–65, and for a time, Sharp and Moats banned baptisms altogether, Doc. 75 at 8. Ultimately, they barred Jarrard from returning to his ministry for fear that he would once again teach a view of salvation that they personally reject.

The defendants' actions fare no better simply because Jarrard spoke within the ministry program of a county jail. First, when the government invites members of the community to share "a diversity of views" within a government facility, officials "may not discriminate based on the viewpoint of [those] private persons whose speech it facilitates." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995). That is precisely what Polk County did by "encourag[ing] Clergy from the community to minister to the inmates," Doc. 53-5 at 3—who, for many years, only needed to ask to do so, Doc. 62 at 34–35. Jail officials may not

then pick and choose which of those individuals to admit based on how closely their views align with the officials' own. *See Rosenberger*, 515 U.S. at 829–30; *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784–86 (1978).

Second, even if Polk County had not opened up its Jail as a limited forum for community ministry, officials still could not exclude Jarrard based on disagreement with his religious messages. Indeed, the government may never exclude speech on the basis of viewpoint within a government facility—even in a so-called "nonpublic forum" like a jail which has not been designated for expressive activity. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 49 (1983). To be sure, the government has a wider latitude to regulate speech in nonpublic fora, but may do so only if "the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). Even when government authority to regulate private expression is at its zenith, officials may not "den[y] access to a speaker solely to suppress the point of view he or she espouses on an otherwise includible subject." *Searcey v. Crim*, 815 F.2d 1389, 1391 (11th Cir. 1987); *see also Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215, 1240 (11th Cir. 2019) ("[E]ven in a nonpublic forum, any barrier to access or restriction on speech must be viewpoint neutral[.]").

Regardless of the type of forum at issue, Sharp and Moats plainly violated the Constitution by excluding Jarrard from the jail and the ministry program solely because of the particular view of the Bible he has expressed. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811 (1985); *Searcey*, 815 F.2d at 1391.

**B.    The suppression of Jarrard's religious expression is not justified on the theory that he should be treated as a "government employee" under *Pickering*.**

The district court allowed Sharp and Moats to evade this most basic First Amendment protection by recharacterizing Jarrard's ministry as speech by a "government employee," subject to greater restriction under *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). But *Pickering* has nothing to do with the type of program in which Jarrard participated.

*Pickering* addresses the extent to which the government may restrain the speech of its own employees in the interest of maintaining an efficient workplace. On one hand, *Pickering* rejected the idea that individuals sacrifice their First Amendment rights by accepting government employment; it "settled that a state cannot condition public employment on a basis that infringes" those rights. *Connick*, 461 U.S. at 142. On the other, *Pickering* recognized that, as an employer, the government may have special interests in controlling speech that relates only to workplace affairs. Thus, *Pickering* "seek[s] a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the

interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quotation and alteration omitted). The framework sorts the government's (impermissible) restriction of an employee's right to express himself on matters of concern to the First Amendment from the government's (permissible) regulation of speech on matters of purely private, workplace concern. *See Connick*, 461 U.S. at 143, 154 (the "primary aim" is to ensure "full protection of speech upon issues of public concern," while preventing "every employment decision" from being made "a constitutional matter").

The unique interests in regulating government workplaces are absent here. Jarrard was *not* an employee of the Polk County Jail. In fact, he was nowhere close. Jarrard was, by the County's own description, merely a "participant in the volunteer programs and activities offered by the Polk County Jail." Doc. 60-1 at 20. More specifically, he was a volunteer in a program through which the Sheriff's Office "encourage[d] Clergy from the community to minister to the inmates." Doc. 53-5 at 3. Jarrard was not paid by the Sheriff's Office, Doc. 60 at 171, he did not deliver messages on behalf of the Sheriff's Office, and the content of his ministry was not directed in any meaningful way by the Sheriff's Office. *See generally* Docs. 60-1, 60-7 at 2–4 (volunteer application forms); Doc. 61 at 24–25. Indeed, although a jail officer would instruct ministry participants on "safety stuff" before they could meet with inmates, the volunteers crafted their own teachings. Doc. 61 at 25; *see also*

21

Doc. 63 at 12. The Jail did not even require volunteers to show up if they did not want to. *Cf.* Doc. 62 at 34–35 (stating that, of 140 approved ministers, "[l]ess than ten" would "actually show up").

The district court made much of the fact that "courts have extended the application of the *Pickering* analysis to cover more than just traditional public employees." Doc. 75 at 20 (quoting *McKinley v. Kaplan*, 262 F.3d 1146, 1150 n.5 (11th Cir. 2001)). Perhaps so, but the cases the district court referenced concern quasi-employment relationships that resemble traditional government employment to a significantly greater degree than here. Those cases involved government contractors, political appointees, and volunteer members of a "semi-professional" fire department. Doc. 75 at 20–21 (citing *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (government contractor); *Rodin v. City of Coral Springs, Fla.*, 229 F. App'x 849, 852, 855 (11th Cir. 2007) (firefighter); *McKinley*, 262 F.3d at 1150 n.5 (political appointee to public advisory board)). In each case, the quasi-employee acted under the direction of government officials to perform important governmental services that would otherwise be performed by a traditional employee. *See Umbehr*, 518 U.S. at 678 (discussing government's use of "contractual power" to further "its interests as a public service provider"); *McKinley*, 262 F.3d at 1150–51 (emphasizing political appointee's "advisory or policy-making roles" and duties to "represent[] . . . the County and [its] Commissioner"); *Rodin*, 229 F. App'x at 850

22

(discussing fire department "staffed by both paid and volunteer firefighters").  That the government might have certain needs to regulate these quasi-workplaces to ensure efficiency and productivity is not relevant to the markedly different relationship here.  Jarrard and his fellow volunteer religious advisors do not stand in the shoes of any traditional government employee and do not provide any service that would otherwise fall to government employees to perform.[9]

Moreover, the Supreme Court has suggested caution in extending *Pickering* too far from its core context.  In determining that similar employment interests apply to government contractors, the Court cautioned that *Pickering* must nevertheless be applied differently there because the government has *less* need to regulate a contractor's speech than an employee's.  *Umbehr*, 518 U.S. at 680.  That is, paid contractors "lie somewhere between the case of government employees, who have the closest relationship with the government, and our other unconstitutional conditions precedents, which involve persons with less close relationships with the government."  *Id.*  Circuits around the country have likewise "cautioned against extending the [doctrine] beyond the public employment context."  *CarePartners,*

---

[9] The district court's passing reference to two unpublished district court cases in which *Pickering* was applied to volunteer police chaplains does not aid its analysis.  Doc. 75 at 21.  Neither case actually considered the question of *whether* or *why Pickering* should apply to such individuals.  *See Mustapha v. Monken*, 2013 WL 3224440, at *6 (N.D. Ill. June 25, 2013) (applying *Pickering* with no explanation); *Mayfield v. City of Oakland*, 2007 WL 2261555, at *4 (N.D. Cal. Aug. 6, 2007) (same).

23

*LLC v. Lashway*, 545 F.3d 867, 881–82 (9th Cir. 2008) (collecting cases from First, Second, Third, Fifth, Sixth, Seventh, and Tenth Circuits).

This Court should not extend that doctrine to Jarrard, who is significantly farther still from the interests and control of the government. While the government might have an "interest in staffing their offices with employees they fully trust," especially those in "policy-making roles," *McKinley*, 262 F.3d at 1150, it has no interest at all in policing the theological contours of a minister's discussions with inmates. Jail officials do not "hire" volunteer ministers to be spokespeople for the Jail's preferred religious views—a preference which, under the Establishment Clause, the Jail and its officials cannot enforce. *See, e.g.*, *Larson v. Valente*, 456 U.S. 228, 244 (1982). Indeed, even the defendants have not claimed that "their religious views constitute a legitimate government interest," which the district court opined "would be an absurd argument." Doc. 75 at 12.

The district court's observation that the ministry program bears some superficial similarities to employment does not change the analysis. The court observed that volunteers were required to fill out an application form that referenced "hiring" ministers to perform volunteer "work," had to submit to security screening and non-disclosure rules, and were generally organized in some way by a "lead" minister who had participated in the ministry program for years. Doc. 75 at 21–22. Features like these are hardly limited to the employment context but instead restrict

24

access to a wide array of public opportunities. The government imposes similar requirements on those who wish to attend college, practice law, fly a plane, buy a firearm, visit a family member in jail, and much more. And First Amendment cases are littered with examples of government fora, permitting regimes, or other programs that require speakers to seek similar permission to engage in expressive activity. *See, e.g.*, *Keister v. Bell*, 29 F.4th 1239 (11th Cir. 2022) (application required to evangelize on public university grounds); *Barrett*, 872 F.3d at 1217 (written request and personal interview required to speak at school board meeting); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257 (11th Cir. 2006) (permit required to hold outdoor festival). That does not transform these programs into government efforts to hire "employees," and none of the cases cited was analyzed under *Pickering*.

Worse still, not even the defendants viewed these screening controls to be demanding—and Jarrard's ministry in the Jail began *before* these mechanisms even existed. The County revised its ministry policies in 2016, after Jarrard had already been excluded from the Jail once and in the wake of the ongoing conflict over his teachings about baptism. Doc. 53-2; Doc. 62 at 34. Before then, volunteer ministers barely needed to apply. Doc. 62 at 34. When Jarrard first began in Polk County, citizens could "get on the jail ministry list," simply by "com[ing] up and ask[ing]." Doc. 62 at 33. Jarrard's first request to participate was approved within minutes.

Doc. 60 at 107. At one point more than 140 people were on the list. Doc. 64 at 34. And even *after* Sharp and Moats revamped the process "of how to get put on the list" by instituting a basic application form, the Sheriff's Office did only the barest filtering of participants. Doc. 64 at 35. According to Sharp, the office would simply do "some verification" of the application—for example, to confirm that the applicant's claimed place of worship "is really a church"—but would otherwise approve applicants as long as they completed the form and posed no security threats. Doc. 64 at 35–36.

Finally, the district court elides the many central features of employment that are absent here, most importantly any real direction or control over volunteer ministers' work. *See, e.g.*, *Marie v. Am. Red Cross*, 771 F.3d 344 (6th Cir. 2014) (applying traditional agency factors to hold that Red Cross volunteers were not employees for Title VII protections). In short, the volunteer ministry program is nothing that resembles an employment relationship. The bare fact that Jail officials exerted some control over the program does not justify expanding *Pickering* to circumstances like these, "wrench[ing] it from its original rationale and curtail[ing] a significant body of free expression that has traditionally been fully protected." *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004).

**C.    Even if *Pickering* applied, Jarrard's religious expression is protected by the First Amendment.**

Even if *Pickering* were the correct framework for this case, Jarrard's religious expression is unquestionably protected.

The *Pickering* analysis proceeds in two stages.  First, the court asks a "threshold inquiry . . . comprised of two requirements": whether the employee spoke "as a citizen" and "on a matter of public concern."  *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1160 (11th Cir. 2015) (discussing *Garcetti v. Ceballos*, 547 U.S. 410, 421, 423 (2006)).  Second, if the employee did, "'the possibility of a First Amendment claim arises,' and the inquiry becomes one of balance."  *Id.* (quoting *Garcetti*, 547 U.S. at 418).  At this second stage, the court asks "'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public'" by balancing the "public and private interests articulated in *Pickering*."  *Id.* at 1159–60 (quoting *Garcetti*, 547 U.S. at 418).

Jarrard's ministry satisfies this test.

**1.    Jarrard's ministry satisfies *Pickering*'s "threshold inquiry" into constitutionally protected expression.**

*Pickering*'s "threshold inquiry" separates expression by a government employee that "implicate[s]" his First Amendment rights as a citizen from that which pertains only to his interests as an employee.  *Alves*, 804 F.3d at 1160.  It looks to

27

the "nature of the speech at issue" to determine whether there are First Amendment interests that must be balanced against the government's need to regulate the speech as an employer. *Kennedy*, 142 S. Ct. at 2423. Jarrard's religious ministry clears the threshold.

### a. Free exercise claims are not subject to *Pickering*'s threshold inquiry.

At the outset, there is no need to conduct a threshold inquiry here at all. Although *Pickering* and its progeny focus on employees' free speech rights, Jarrard contends that he has been retaliated against for both the *expression* of his religious beliefs and also—inextricably—his *exercise* of those beliefs through his ministry. Doc. 53 ¶ 84. The district court essentially bypassed Jarrard's free exercise claim, opining that it would be analyzed the same as his speech claim. Doc. 75 at 35 n.15.[10] But this Court's cases show that where the government punishes an employee for *exercising* his religion, then the relevance of the First Amendment's protections are clear and there is no need to engage in this threshold inquiry at all. In *Watts v. Florida International University*, 495 F.3d 1289 (11th Cir. 2007), a counselor at a public university alleged that his rights to free speech and religious exercise were violated when he was fired for recommending that a Catholic patient consider

---

[10] The court also suggested in passing that Jarrard may have abandoned his free exercise claim. Doc. 75 at 35 n.15. Not so. That claim is pled in the complaint, Doc. 53 ¶ 84, and Jarrard pursued it at both the motion-to-dismiss stage, Doc. 23 at 12, 16, and summary judgment, Doc. 70-2 at 24–25.

therapy options offered through a church. Although this Court rejected the free speech claim under *Pickering* (because treatment advice "to a single patient within the confines of a counseling session" was not citizen speech on a matter of public concern) the Court allowed the *free exercise* claim to go forward, without any application of *Pickering* at all. *Id.* at 1293–95. Because the counselor alleged that his religious beliefs compelled him to offer the advice he did, he had stated a valid free exercise claim, even though his advice was delivered in his job as a government counselor. *Id.* at 1294–1300; *see also Meriwether v. Hartop*, 992 F.3d 492, 504–17 (6th Cir. 2021) (applying *Pickering* to employee's free speech claim but not his free exercise claim based on same expression). Elsewhere, this Court has suggested that government employees' free exercise claims may be subject to *Pickering* balancing, but without any mention of a need to satisfy the threshold inquiry. *See Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1286 (11th Cir. 2012), *abrogated on other grounds by EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015). And the Supreme Court itself has raised the question whether this threshold inquiry even makes sense for religious exercise. *Kennedy*, 142 S. Ct. at 2425 n.2.

Thus, for the purposes of Jarrard's claim that he was retaliated against for the *exercise* of his religious beliefs about baptism, the Court should simply proceed to weigh the government's interests in suppressing such exercise without attempting a

"threshold" filtering of protected from unprotected religious exercise. Nonetheless, as explained below, Jarrard's claims clear this threshold regardless.

### b. In ministering to inmates based on his religious beliefs, Jarrard spoke for himself as a citizen.

The first element of the "threshold" inquiry is whether the government has restricted the individual from expressing his own views "as a citizen" or instead has sought to control the employee's delivery of "speech the government itself ha[s] commissioned or created." *Kennedy*, 142 S. Ct. at 2424 (quotation omitted). The district court appeared to confuse this question for whether Jarrard taught and exercised his views on salvation in the course of his general ministry at the Jail. *See* Doc. 75 at 25–26. But, as the Supreme Court recently reiterated, the question is not whether the employee's speech occurred in relation to his work or "within the office environment," but rather whether the employee spoke "to convey a government-created message" or delivered "speech the [government] paid him to produce." *Kennedy*, 142 S. Ct. at 2424–25 (quotation omitted); *see also Hubbard v. Clayton Cnty. Sch. Dist.*, 756 F.3d 1264, 1268 (11th Cir. 2014) (school employee spoke as a citizen because speech "was not an official communication of the School District" and "could not be reasonably attributed to the School District"). That matters because if the speech was "the government's own speech," then the government may "control" the message. *Kennedy*, 142 S. Ct. at 2423. So the question here is: In ministering to inmates based on his religious beliefs, did Jarrard speak for himself

30

or did those theological messages "amount to government speech attributable to" the County Jail? *Id.* at 2424. The answer is assuredly the former.

There is no serious argument that the Jail enlisted volunteer ministers to be mouthpieces for the Jail's own religious beliefs. Even if such volunteers were understood to be "employees," the Jail specifically "hired" them to be available to counsel inmates upon request, in accordance with "his or her specific faith." Doc. 53-5 at 3. At most, ministers were "commissioned" to be present to "facilitate the free exercise of religious beliefs by the inmates." Doc. 53-5 at 1. But the Jail did not—indeed *could* not—employ these volunteers to espouse any particular theological message or to *deny* the free exercise of faiths with which the Sheriff's Office disagreed. In the words of the district court, the notion that the government has a valid interest in expressing a particular religious view is "absurd." Doc. 75 at 12. Not least because the government cannot constitutionally impose its preferred religious beliefs on inmates. *See, e.g.*, *Larson*, 456 U.S. at 244. And such an idea would make no sense in any event. The volunteer ministry program is open (as it must be) to believers of all faiths, including many that contradict one another. *See* Doc. 53-5; Doc. 68-1. If the Jail "commissioned" Jarrard to teach its preferred interpretation of the Bible, the bizarre implication would be that the Jail "hires" representatives from a multitude of faiths to express the government's own interpretations of their varied, conflicting, and perhaps mutually exclusive beliefs.

31

Surely not. *Cf. Matal v. Tam*, 582 U.S. 218, 236 (2017) ("[I]t is far-fetched to suggest that the content of a registered mark is government speech. If [it is] . . . , the Federal Government is babbling prodigiously and incoherently . . . [and] expressing contradictory views.").

Nor would any reasonable person who observed Jarrard believe him to "speak on the government's behalf and convey its intended message." *Kennedy*, 142 S. Ct. at 2423. Where a message is not "often closely identified in the public mind with the government," that cuts against finding that the speech is the government's. *Cambridge Christian Sch.*, 942 F.3d at 1232 (quotation omitted). That is the case here. Through the ministry program, members of the community may offer religious services to groups of inmates and counsel them privately—with no jail official present—upon request. Doc. 53-5 at 3; Doc. 68-1 at 3. An observer of these religious meetings could not reasonably "associate a [volunteer minister's] message with [the County]," but would associate it with the *individuals* participating. *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1591 (2022). That this occurs in a Jail does not suggest otherwise, especially because inmates are not free to attend services elsewhere and their religious advisors are not free to see them without permission. *Cf. Kennedy*, 142 S. Ct. at 2425 (rejecting argument that coach's prayers on football field must be government speech because they occurred at his place of employment).

32

Further, the "purpose" of Jarrard's ministry is not "governmental in nature." *Cf. Gundy v. City of Jacksonville*, 50 F.4th 60, 79 (11th Cir. 2022) (describing governmental purpose of invocations at legislative sessions). Here, the ministry program is offered "to facilitate the free exercise of religious beliefs by the inmates," Doc. 53-5 at 1—not as "part of [the Jail's] own operations" or "to show who and what the [Jail] and its [officials] stand for," *Gundy*, 50 F.4th at 79 (quotation omitted). The Jail, of course, may not require an inmate to attend religious programming, and any meeting with a minister is purely upon the inmate's own request. Doc. 53-5 at 1–3.

In sum, even if Jarrard were an "employee" of the Polk County Jail, he was not "paid to produce" a particular theological message on behalf of the government. He expressed those beliefs as a citizen.

### c. Jarrard's expression and exercise of his religious beliefs about salvation are core matters of "public concern."

Jarrard's expression and exercise of his religious beliefs about salvation also satisfy the second element of the threshold inquiry as they are, manifestly, matters of "public concern."

This "public concern" inquiry divides speech that relates only to the concerns of the workplace from that which touches on matters of broader First Amendment significance. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465–66 (1995); *Connick*, 461 U.S. at 146–47; *Nat'l Treasury Emps. Union v. United*

33

*States*, 990 F.2d 1271, 1273 (D.C. Cir. 1993) ("The contrast [is] between issues of external interest as opposed to ones of internal office management."), *affirmed in relevant part by Nat'l Treasury Emps. Union*, 513 U.S. at 454. The question is whether the speech relates to any "political, social, or other concern [of] the community," *i.e.*, whether it is a kind that the First Amendment values and protects. *Connick*, 461 U.S. at 146; *see also Meriwether*, 992 F.3d at 509 ("The linchpin of the inquiry is . . . the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." (quotation omitted)); *Grigley v. City of Atlanta*, 136 F.3d 752, 755 (11th Cir. 1998) ("The public concern requirement exists because that category of expression is at the core of the First Amendment's protections[.]"); *Brown v. Polk County*, 61 F.3d 650, 658 (8th Cir. 1995) ("*Pickering* recognizes a public employee's right to speak on matters that lie at the core of the first amendment, that is, matters of public concern . . . .").

To make this determination, the court must evaluate "the whole record" and "ask whether the main thrust of the speech" fairly relates to an issue of relevant concern. *King v. Bd. of Cnty. Comm'rs*, 916 F.3d 1339, 1347 (11th Cir. 2019) (quotation omitted). The content of the speech is "the most important factor." *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1284 (11th Cir. 2006). And the question for summary judgment is only whether the speech is "is *capable* of being

34

fairly . . . characterized" as relating to a matter of public concern—not whether it "definitively" does. *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 916 (11th Cir. 1993) (emphasis altered).

The expression and exercise of religious belief undoubtedly fits this description. *Connick* itself confirms as much. There, the Supreme Court explained that the *Pickering* framework is rooted in the need to guard against actions that "suppress the rights of public employees to participate in public affairs," including actions that suppress employees' religious rights. 461 U.S. at 144–45. The doctrine reflects the Court's "responsibility . . . to ensure that citizens are not deprived of fundamental rights by virtue of working in the government." *Id.* at 147. Even before *Pickering* confirmed that public employees retain First Amendment rights in the workplace, it was "already too late in the day to doubt that" restrictive employment policies might impermissibly stifle "the liberties of religion and expression." *Id.* at 144 (quotation omitted). Thus, several Circuits have held that the expression of religious belief is "of *inherent* public concern." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011) (emphasis added); *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 565 (4th Cir. 2011) (listing religion among "topics [that] plainly touch[] on issues of public, rather than private, concern"); *Brown*, 61 F.3d at 658 (8th Cir.) (expression of personal religious views "lies right at the core of the free exercise clause" and is matter of public concern); *see also Scarbrough v.*

*Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 257 (6th Cir. 2006) (employee's "speech on his religious views and on homosexuality are matters of public concern").[11]  And just last year, the Supreme Court confirmed that a high school football coach's personal prayers following a game "implicate[] a matter of public concern"—a point apparently so obvious that the parties in the case agreed upon it.  *Kennedy*, 142 S. Ct. at 2423.

Even if religious expression and exercise were not inherently matters of public concern, the circumstances surrounding Jarrard's particular ministry confirm the point.  First, the district court was simply wrong to suggest that Jarrard's ministry loses protection because he communicated his beliefs "to a limited pool of inmates rather than the public at large."  Doc. 75 at 31 (quotation omitted).  This Court and the Supreme Court have repeatedly held that even a purely private statement may address a matter of public concern.  *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378, 386 n.11 (1987) ("The private nature of the statement [between coworkers] does

---

[11] The district court observed that the Fifth Circuit has held that a police officer signaling his religious conviction by wearing a cross on his uniform was "not a matter of 'public concern.'"  *Daniels v. City of Arlington*, 246 F.3d 500, 504 (5th Cir. 2001).  Setting aside that the court there confined its holding to the facts of the case, the court's analysis addresses whether an officer speaks *for himself* in displaying a religious symbol on his uniform and *not* whether religious expression is generally a "public concern."  *See id.* (opining that although religious belief "obviously is a matter of great concern to many," the "risk that the city may appear to endorse [the officer's] religious message" cut against finding that the speech cleared the *Pickering* threshold).

not . . . vitiate the status of the statement as addressing a matter of public concern."); *O'Laughlin v. Palm Beach County*, 30 F.4th 1045, 1052 (11th Cir. 2022) (same); *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) (same). More to the point, Jarrard spoke far more openly than the private discussions between coworkers that have been protected in these and many other cases. Indeed, the district court acknowledged that Jarrard's purpose was to reach broadly and "get[] as many folks baptized into Christ as [he] can before Jesus returns." Doc. 75 at 31 (quotation omitted). Yet, bizarrely, the court seems to have counted that as an indication that Jarrard's religious ministry did *not* touch on public concerns. The opposite is true. Whatever one's opinion on the validity of Jarrard's religious views, it would be difficult to deny the public significance of the potential end of earthly life and what individuals must do to prepare for it.

At bottom, the district court took an unduly narrow view of speech that touches on matters of public concern—seeming to reduce that question to whether the speech was *newsworthy*. *See* Doc. 75 at 29, 31–32. To be sure, the government's suppression of speech on matters "of legitimate news interest" raises a public concern. *O'Laughlin*, 30 F.4th at 1051 (quotation omitted). And in many cases that question is at the heart of the dispute—for example, when determining whether accusations of office misdeeds were merely workplace complaints or instead expressions of broader concerns like government fraud. *See, e.g.*, *id.*; *King*, 916 F.3d

37

at 1346–50. But *Pickering* does not require a showing of public attention. Rather, the "'public concern' criterion [refers] not to the number of interested listeners or readers but to whether the expression relates to some issue of interest beyond the employee's bureaucratic niche." *Nat'l Treasury Emps. Union*, 990 F.2d at 1273. Nor is the question whether there would be public interest in the speaker's *personal opinion* on a topic; it is whether the *topic itself* touches on issues of First Amendment significance. *See, e.g.*, *Rankin*, 483 U.S. at 386 (employee's private comment that he hoped an assassination attempt on Ronald Reagan would succeed "plainly dealt with a matter of public concern"). Here, Jarrard's expression of his religious beliefs about the requirements for salvation does, and any inquiry into its additional "newsworthiness" is beside the point.

### 2.    The balance of interests weighs heavily in Jarrard's favor.

Because Jarrard's religious ministry clears the threshold inquiry and implicates the First Amendment, the second step of *Pickering* places the burden on the government "to prove that its interests as employer outweigh" those central First Amendment rights. *Kennedy*, 142 S. Ct. at 2425. This is true "[w]hether one views the case through the lens of the Free Exercise or Free Speech Clause." *Id.* at 2426. This balancing ensures that the government does not burden constitutionally protected activity unless necessary to promote "efficiency and integrity in the discharge of official duties." *Connick*, 461 U.S. at 151. On this record and at this

38

stage of the case, the defendants cannot carry their burden. *See Cook*, 414 F.3d at 1320.

An important point bears repeating: Moats and Sharp do not claim that enforcement of their personal religious views is a legitimate government interest. Doc. 75 at 12. Stated differently, they do not suggest that imposing their preferred beliefs is needed to promote efficiency in the workplace. Yet, as the district court found, a jury could easily conclude that Moats and Sharp's actions were "motivated by [those] illegitimate interests (theology) rather than legitimate interests." Doc. 75 at 13; *see supra* pp. 17–18 (discussing evidence). At summary judgment, that is enough to doom any contention that suppression of Jarrard's speech was necessary to address genuine workplace needs.

To be sure, Moats and Sharp have offered a different account, raising the specter of disruption and chaos if they are not allowed to discriminate against Jarrard. Doc. 57-3 at 10–11. They pressed the court below to broadly defer to their suppression of Jarrard's religious expression in the name of "internal jail operations," asserting that his Biblical messages irked ministers of different faiths and caused inmates to fear damnation, "which is highly undesirable to jail administrators." Doc. 57-3 at 11–12. But their appeals to these concerns fall short for at least two reasons.

*First*, as recognized by the district court, a jury could "easily find" the defendants' "after-the-fact" justifications to be pretextual.  Doc. 75 at 12.  As noted, there is significant evidence to contradict the notion that Moats and Sharp were genuinely motivated by a desire to ensure order, including evidence that Jarrard had previously performed his ministry (including baptisms) without issue, and evidence that baptisms were not particularly cumbersome and had been successfully allowed elsewhere.  Doc. 75 at 12–13 (discussing evidence).  Further, a reasonable jury could take Moats at his word that Jarrard had been excluded because the Jail's "stance" was that "baptism can wait until after release since it is not a requirement for salvation."  Doc. 61-2 at 2.  Indeed, the "only contemporaneous evidence we have[] focuses on theology, not safety or security."  Doc. 75 at 12.

*Second*, as the district court observed in denying the defendants' earlier motion to dismiss, these purported concerns with disruption are inextricable from their theological disagreements with Jarrard.  *See* Doc. 34 at 42 ("Even Defendants' articulated reason for denying Plaintiff Jarrard's 2020 application—his involvement in 'contentious behavior and conflict' at other jails—is ultimately grounded in his support for inmate baptism.").  Their concern, it seems, is that too many inmates shared Jarrard's religious beliefs.  Doc. 61 at 35–36.  Or that ministers who did not share his beliefs complained about them.  Doc. 60 at 36–37.  It remains for a jury to

decide whether the defendants' stated interest in promoting "harmony" is any different from their desire to instill religious orthodoxy.

Despite the defendants' already-rejected rationalizations about safety and security, the record amply demonstrates that they excluded Jarrard from the ministry program because they disagree with his views on baptism—something the government has no valid interest in. The balance of interests is thus wholly one-sided, and Jarrard's ministry is constitutionally protected, even under *Pickering*.

## II.    Qualified immunity does not bar Jarrard's retaliation claim.

The district court was wrong to reject Jarrard's retaliation claim on the merits, and it was wrong to conclude that qualified immunity would provide any refuge.

### A.    Qualified immunity does not apply to Jarrard's request for injunctive relief.

First, the district court overlooked Jarrard's request for equitable relief on his retaliation claim. Although the court correctly noted that Jarrard dropped his request for equitable relief against certain abandoned policies, *see infra* Pt. III, he did *not* do so with respect to his retaliation claim.[12] Doc. 68 at 2 ("In light of this policy change,

---

[12] The district court's apparent confusion may have come from the fact that the parties sometimes discussed Jarrard's withdrawal of his request for injunctive relief using broad language. Doc. 68 at 1 (notifying court "of the impact of th[e policy] change on Jarrard's claim for injunctive relief"); Doc. 69 at 1 n.2 ("Plaintiff Jarrard withdrew his injunctive relief claim following adoption of a new policy."). In context, however, these statements pertain specifically to Jarrard's policy claims. Even in the briefing on the defendants' motion for summary judgment on Jarrard's

Plaintiff-Jarrard hereby withdraws his claim for injunctive relief as to the unbridled discretion of the Second and Third Policy."). His request for an "injunction . . . allowing [him] to return to his previous status as ministry [and] to perform the baptisms requested" remains. Doc. 53 ¶ 86.

Qualified immunity is no impediment to such relief. *Pearson v. Callahan*, 555 U.S. 223, 242–43 (2009). For this reason alone, qualified immunity cannot provide a basis for summary judgment against Jarrard's retaliation claim.

## B. Qualified immunity does not shield the officers' retaliation against Jarrard because he expressed disfavored religious beliefs.

Moats and Sharp are not entitled to qualified immunity on Jarrard's claims for monetary damages because it has long been clear that the First Amendment prohibits the blatant discrimination at issue here.

Qualified immunity shields officials only if "their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *T.R. ex rel. Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 882 (11th Cir. 2022) (quotation omitted). To show that a right was clearly established, the plaintiff need not identify a prior case "with indistinguishable facts." *D.H. ex rel. Dawson v. Clayton Cnty. Sch. Dist.*, 830 F.3d 1306, 1318 (11th Cir. 2016) (quotation omitted). Rather, "a broad statement of principle within the

---

retaliation claim, the only references to Jarrard's withdrawal of his request for injunctive relief relate to the policy claim. Doc. 70-2 at 20–21; Doc. 73 at 1–2.

Constitution, statute, or case law that clearly establishes a constitutional right" is sufficient. *Id.* (quotation omitted). Where the unconstitutionality of an officer's actions is a matter of "obvious clarity," there is no need for a prior decision with "fundamentally similar or materially similar facts." *Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) (quotation omitted); *see Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) ("[W]e need no longer focus on whether the facts of a case are materially similar to prior precedent, . . . [but] also assess whether the facts of the instant case fall within statements of general principle from our precedents."). "Officials need only have reasonable warning that their conduct violated constitutional rights." *Smith v. LePage*, 834 F.3d 1285, 1291 (11th Cir. 2016).

They certainly had such warning here. As described, the claim here concerns one of the most elemental principles of First Amendment law: government officials may not retaliate against a person simply because they disagree with his religious expression and exercise. *See Johnson*, 491 U.S. at 414; *Barnette*, 319 U.S. at 642; *supra* Part I.A. In this Court's words, "there is *no justification* for harassing people for exercising their constitutional rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005) (emphasis added). Whether the ministry program is viewed as a limited public forum, a nonpublic forum, a government benefit, a volunteer opportunity, an employment relationship, or anything else, the answer from

43

controlling cases is the same: the Constitution prohibits government officials from excluding Jarrard from the program based on their disagreement with his religious expression.[13]   As the Supreme Court recently reiterated, in cases where "official expressions of hostility to religion accompany laws or policies burdening religious exercise," the Court will "set aside such policies *without further inquiry*."  *Kennedy*, 142 S. Ct. at 2422 n.1 (quotation omitted) (emphasis added) (citing cases).  No reasonable officer could have believed he was entitled to forbid Jarrard from the prison ministry program on the basis of theological disagreement with his ministry.

Nor can the defendants obscure the clarity of the First Amendment's demands by asking how *Pickering* might apply to a religious volunteer.  First, as detailed above, the answer is simply that it doesn't apply.  Jarrard is not a government employee, he did not look anything like an employee when he signed up to participate in a program that invited citizens to share a diversity of religious views

---

[13] *See, e.g.*, *Carson v. Makin*, 142 S. Ct. 1987, 1998 (2022) (government may not "exclude some members of the community from an otherwise generally available public benefit because of their religious exercise"); *Agency for Int'l Dev.*, 570 U.S. at 214 ("[T]he Government may not deny a benefit to a person on a basis that infringes his . . . freedom of speech even if he has no entitlement to that benefit." (quotation omitted)); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111–12 (2001) ("speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint"); *Connick*, 461 U.S. at 142 (government "cannot condition public employment on a basis that infringes" First Amendment rights); *Cook*, 414 F.3d at 1321 ("[E]ven in a non-public forum, the law is clearly established that the state cannot engage in viewpoint discrimination[.]"); *see also supra* Part I.A.

44

with prisoners, and no reasonable officer would have had any doubt on those points. *See supra* Part I.B.  It is telling that the defendants did not even think to recast this claim as a novel *Pickering* extension until they failed to dismiss it under a more straightforward application of government forum analysis.  *See* Doc. 18-2 (Brief in Support of Pre-Answer Motion to Dismiss) (not mentioning *Pickering*); Doc. 34 (Opinion & Order) (same).

Moreover, even if *Pickering* were applied, its outcome is clear.  *See supra* Part I.C.  Even as an employer, the government has no legitimate interest in dictating to ministers what they must believe about the Bible.  The district court got this much right: such an idea would be "absurd," and any attempt to administer the program in that way would have been plainly unconstitutional.  *See, e.g.*, *Larson*, 456 U.S. at 244.  And, while *Pickering* is an ill fit for this situation, the critical points that resolve this case under *Pickering* are also clearly established: (1) the County did not commission Jarrard to be the mouthpiece for its own interpretation of the Bible, *supra* pp. 30–33; (2) religious freedom is of central value to the First Amendment and this Court, the Supreme Court, and other federal courts have therefore held that a public employee's religious expression and exercise are protected activity, *supra* pp. 33–38; and (3) the government cannot justify any denial of those rights through the Sheriff's desire to prevent inmates from hearing Jarrard's religious views, *supra* pp. 38–40.  The arguments in this case might raise interesting questions about how

overlapping strands of First Amendment doctrine specifically weave together.  But the problem for the defendants is that *no* answers to those questions would justify their retaliation against Jarrard for saying the "wrong" things about baptism.

If the point is not already clear, a simple tweak of the facts should make it abundantly so: Consider the situation if, rather than excluding Jarrard because of his views on baptism, the Jail excluded a volunteer because he had made himself known to be Muslim, or Jewish, or Hindu, or Sikh, or any other religion that did not meet the Sheriff's fancy.  What if the Jail's "stance" were that inmates of those faiths could "wait until after release" to meet with their clergy because their beliefs were not all that important?  Would there be any doubt that such blatant discrimination against their religious views is unconstitutional?  Surely not.  And the answer must be the same here, where Jarrard has been excluded for being supposedly the "wrong" kind of Christian.

## III.  The district court erred in rejecting Jarrard's claims against the unbridled discretion given to officials to admit or deny ministers.

To ensure that a government official's decision whether to permit expressive activity "is not based on the content or viewpoint of the speech being considered," there must be "some minimal procedures and standards . . . to channel the discretion of" the official.  *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1199–1200 (11th Cir. 1991) (quotation omitted).  As the district court all but recognized, Doc. 75 at 38, the Second and Third Policies violate this requirement.  And because this Court

has repeatedly held that policies requiring individuals to seek permission before engaging in expressive activity must include governing standards, qualified immunity does not protect Moats and Sharp for promulgating and enforcing such constitutionally deficient policies.

### A. The policies lacked any standard to guide whom Jail officials would allow to participate in the ministry program.

The First Amendment prohibits the government from giving an official unbridled discretion to permit or deny expressive activity in a government forum. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769–70 (1988). This doctrine is intended to avoid "circumstances" in which a deciding "official can grant or deny" permission to engage in expressive activity "for any reason she wishes" because such "unconstrained power . . . creates an incentive for speakers to self-censor" and makes it difficult to know whether the "decision was impermissibly based on content or viewpoint." *Barrett*, 872 F.3d at 1221. This rule squarely applies to the Jail's policies governing who may serve as volunteer ministers.

The Sheriff's Office invites and encourages members of the public to minister to inmates through its jail ministry program. Doc. 53-5 at 3 (Third Policy); Doc. 68-1 (Fourth Policy). In doing so, Jail officials have created an opportunity for private speakers to use government property to engage in expressive activity. Yet, participation in the program requires the Jail's permission first. Thus, "[a] prior restraint on expression exists" because Jail officials "can deny access to [the] forum

for expression before the expression occurs." *Barrett*, 872 F.3d at 1223 (quotation omitted). This Court has recognized that "[p]ermitting ordinances and licensing ordinances are classic examples of prior restraints, but the category is not rigid." *Id.* (citations omitted). In *Barrett*, for example, the policy was "not formally a licensing or permitting scheme," but nonetheless was a prior restraint "because it prevent[ed] members of the public from speaking . . . unless they comply with the [p]olicy's requirements." *Id.* (emphasis omitted). The same is true here. Accordingly, the doctrine prohibiting unbridled discretion in government-created fora applies. *Id.* at 1222.

To conclude otherwise would require the bizarre determination that the religious teachings of volunteer ministers are actually government speech. But the Jail neither "speak[s] on its own behalf" nor "convey[s] a government message" when it permits volunteer religious advisors to minister to inmates. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 214–15 (2015); *supra* pp. 30–33. Because the ministers' expression is not government speech, it necessarily is private. *Cambridge Christian Sch.*, 942 F.3d at 1236; *see also Walker*, 576 U.S. at 209. Restrictions on such speech are thus evaluated through forum analysis. *Walker*, 576 U.S. at 215; *see also Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 678.

A policy regulating access to a government forum must constrain the deciding official's discretion in at least two ways: (1) by providing "standards by which the official's decision must be guided" so that the official may not "grant or deny a permit for any reason she wishes"; and (2) by providing a "time limit within which [the official] must make a decision." *Barrett*, 872 F.3d at 1221–22. The Second and Third Policies do neither.

The Second Policy provides: "Clergymen and religious advisors wishing to hold services or conduct programs in the jail must make written application to the Polk County Sheriff's Office with supporting documentation, attend a training session and then be approved by the Jail Administrator." Doc. 53-4 at 2. The policy contains no limits on the deciding official's discretion. And the Third Policy fares no better. Although the revised policy specifies additional steps required to be allowed to minister in the jail, it still fails to provide criteria to guide the Jail officials' discretion in reviewing ministry applications. Doc. 53-5 at 3 ("[The] Sheriff's Office encourages Clergy from the community to minister to the inmates. Clergymen and religious advisors wishing to hold services or conduct programs in the jail must submit a volunteer application. Members of the clergy allowed within the inner security perimeter or allowed contact visitation[] must complete background checks, including the jail ministry program[.]"). Both policies therefore lack constitutionally required standards. *See City of Lakewood*, 486 U.S. at 769.

49

The policies allow for the exercise of unconstitutionally unbridled discretion for a second reason, too: Neither specifies a time limit within which the official must decide on an application. *See Barrett*, 872 F.3d at 1222. If a "prior restraint is content based, then the lack of a time limit necessarily renders the prior restraint unconstitutional." *Id.* Here, the prior restraint is plainly content-based. The application requires the applicant to summarize the programming she would offer. Doc. 60-1 at 16; Doc. 60-7 at 10. Because the policies "require prospective speakers to disclose . . . the subject matter about which they wish to speak," the applications pose a "risk of content-based discrimination." *Barrett*, 872 F.3d at 1227. Said otherwise, the policy allows an official to "chill[] or effectively censor[] [speech] on the basis of content or viewpoint." *Id.* at 1229. The First Amendment demands reins upon such discretion.

**B.   Qualified immunity does not shield the policies' obvious failure to specify constitutionally required standards.**

Despite the policies' obvious failure to include constitutionally required standards, the district court concluded that the Jail officials are entitled to qualified immunity for two reasons. Neither is persuasive.

First, the court mistakenly concluded that the unbridled-discretion doctrine's application to nonpublic fora is an open question. Doc. 75 at 40. Not so. For more than thirty years, this Court has applied the doctrine when evaluating restrictions on speech in nonpublic fora. *See Atlanta J. & Const. v. City of Atlanta Dep't of*

50

*Aviation*, 322 F.3d 1298 (11th Cir. 2003) (en banc); *Sentinel Commc'ns*, 936 F.2d at 1189.  This Court's more recent decision in *Barrett* did not change that.  Rather, it merely clarified—under the Supreme Court's revised forum doctrine distinguishing limited public fora from nonpublic fora, *see Walker*, 576 U.S. at 215–16—that the unbridled discretion doctrine *also* extends to limited public fora.  *See Barrett*, 872 F.3d at 1226.  This makes sense because, as this Court recognized, the purpose served is the same: "Limited public fora likewise do not tolerate viewpoint discrimination, so the unbridled-discretion doctrine can serve the same purpose in a limited public forum that it serves in a nonpublic forum: combatting the risk of unconstitutional viewpoint discrimination."  *Id.* (citation omitted).

Moreover, "there is broad agreement" among the Circuits "that even in limited public and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment."  *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 386 (4th Cir. 2006) (citing decisions from the Seventh, Eighth, Tenth, and Eleventh Circuits).  These decisions constitute "fair notice" to officials that restraints on speech in nonpublic fora must comply with the unbridled-discretion doctrine.  *Richmond v. Badia*, 47 F.4th 1172, 1183–84 (11th Cir. 2022); *see also Carollo v. Boria*, 833 F.3d 1322, 1333 (11th Cir. 2016) (fair warning may come from "a robust consensus of cases of persuasive authority" (quotation omitted)).

Second, the district court reasoned that an official could have believed that the unbridled-discretion doctrine applies only to "permitting schemes," not "hiring procedures." Doc. 75 at 38–39. This proposed distinction is a red herring. Under this Court's precedents, the unbridled-discretion doctrine applies where a policy imposes a *prior restraint* on expression by allowing an official to "deny access to a forum for expression before the expression occurs." *Barrett*, 872 F.3d at 1223 (quotation omitted). The Second and Third Policies squarely fall within this definition of "prior restraint" for the reasons discussed above. What is more, this Court already rejected the argument that the unbridled-discretion doctrine applies only to so-called "permitting schemes." *Id.*; *see also Bourgeois v. Peters*, 387 F.3d 1303, 1317 (11th Cir. 2004) ("Although this doctrine originated with [licensing] cases[,] . . . it has subsequently been held to apply to a wider range of burdens on expression."). Regardless, the Jail's ministry program surely qualifies under any reasonable view of a "permitting scheme." To participate and engage in expressive activity, a minister must apply for permission. No reasonable official could conclude that policies governing access to such a program can be totally unconstrained. *Cf. Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010) ("There need not . . . be a prior case wherein the very action in question has previously been held unlawful." (quotation omitted)).

## CONCLUSION

The order granting summary judgment on Jarrard's retaliation and unbridled discretion claims should be reversed.[14]

Dated: May 12, 2023

Respectfully submitted,

/s/ *John A. Meiser*
John A. Meiser
Meredith Holland Kessler
NOTRE DAME LAW SCHOOL
  RELIGIOUS LIBERTY CLINIC
1338 Biolchini Hall
Notre Dame, IN 46556
(574) 631-3880

Zack Greenamyre
MITCHELL SHAPIRO GREENAMYRE &
  FUNT, LLP
3490 Piedmont Rd., Ste. 650
Atlanta, GA 30305
(404) 812-4747

W. Gerald Weber
LAW OFFICES OF GERRY WEBER, LLC
P.O. Box 5391
Atlanta, GA 31107
(404) 522-0507

*Counsel for Plaintiff-Appellant*
*Stephen Jarrard*

---

[14] Appellant thanks the students in Notre Dame Law School's Religious Liberty Clinic for their assistance with this brief.

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,926 words, excluding the items excluded by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared used Microsoft Office Word in 14-point Times New Roman.

Dated: May 12, 2023                         /s/ *John A. Meiser*
                                            John A. Meiser
                                            *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023, I electronically filed the foregoing with the Clerk of Court of the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: May 12, 2023                     /s/ *John A. Meiser*
                                        John A. Meiser
                                        *Counsel for Plaintiff-Appellant*