APPEAL NO. 23-10332

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## STEPHEN JARRARD,

**Plaintiff/Appellant**

**vs.**

## SHERIFF JOHNNY MOATS, *et al.*,

**Defendants/Appellees.**

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

---

## BRIEF OF APPELLEES

---

Terry E. Williams, Esq.
Georgia Bar No. 764330
Jason C. Waymire, Esq.
Georgia Bar No. 742602

**WILLIAMS & WAYMIRE, LLC**
4330 South Lee St., NE
Building 400, Suite A
Buford, Ga 30518-3027
Telephone: (678) 541-0790
Facsimile: (678) 541-0789

Appeal No. 23-10332    *Jarrard v. Moats, et al.*

## UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF INTERESTED PERSONS

## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Rules of the United States Court of Appeals for the Eleventh Circuit, the undersigned counsel for Defendants-Appellees certifies that, to the best of his present information, knowledge and belief, the following is a full and complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this case and appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and other indefinable legal entities related to a party:

1.    Association County Commissioners of Georgia-Interlocal Risk Management Agency (ACCG-IRMA), insurer for Defendants;

2.    Barclay, Stephanie (counsel for Plaintiff/Appellant);

3.    Honorable Michael L. Brown (United States District Court Judge);

4.    Greenamyre, Zack (counsel for Plaintiff and Appellant);

5.    Jarrard, Stephen (Plaintiff/Appellant);

6.  Kessler, Meredith (counsel for Plaintiff/Appellant);

7.  Law Offices of Gerry Weber, LLC (law firm for counsel for Plaintiffs and

8.  Appellant);

9.  Meiser, John (counsel for Plaintiff/Appellant);

10. Mitchell, Shapiro, Greenamyre & Funt LLP (law firm for counsel for Plaintiff and Appellant);

11. Moats, Johnny (Defendant/Appellee);

12. Morris, Ollie "Mitchell" (Plaintiff);

13. Notre Dame Law School Religious Liberty Clinic (counsel for Plaintiff/Appellant);

14. Polk County Sheriff's Office (associated with Defendants and Appellees);

15. Sharp, Al (Defendant/Appellee);

16. Stroup, Dustin (Defendant);

17. Waymire, Jason (counsel for Defendants and Appellees);

18. Weber, Gerald (counsel for Plaintiffs and Appellant);

19. Williams, Terry (counsel for Defendants and Appellees);

20. Williams & Waymire, LLC (law firm of counsel for Defendants / Appellees).

I am not aware that any publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ Jason C. Waymire
JASON C. WAYMIRE
Georgia Bar No. 742602
Attorney for Defendants

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendants do not view oral argument as necessary or desirable in this case. The issues presented on appeal are not particularly complex, and the facts and legal arguments are adequately presented in the briefs and record such that the decisional process will not be significantly aided by oral argument. Defendants will be pleased, however, to argue their position orally or to provide a supplemental brief if requested in order to assist the Court in resolving any issues.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

    DISCLOSURE STATEMENT..............................................................C-2 of 4

STATEMENT REGARDING ORAL ARGUMENT................................................i

TABLE OF CONTENTS.........................................................................................ii

TABLE OF CITATIONS.......................................................................................iv

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF THE ISSUES............................................................................1

STATEMENT OF THE CASE................................................................................2

    A.    Course of Proceedings.........................................................................2

    B.    Statement of Facts..............................................................................3

STANDARD OF REVIEW...................................................................................10

SUMMARY OF ARGUMENT............................................................................10

ARGUMENT AND CITATIONS TO AUTHORITY..........................................12

I.    PLAINTIFF'S CLAIM BASED ON DENIAL OF HIS VOLUNTEER
    APPLICATION FAILS ...............................................................................12

    A.    Plaintiff's Communications in Jail Ministry Were Not as a
        Citizen.................................................................................................15

    B.    Plaintiff's Baptism Communications Involve Personal
        Religious Views, Not Matters of Public Concern..............................17

    C.    The Sheriff's Office Interest in Peaceful and Efficient Jail
        Administration Outweigh Plaintiff's Interest in Espousing His

View of Baptism to Inmates.................................................19

    D.    Volunteer Jail Ministry Is Not Clearly Established as a
Government Benefit...............................................................21

    E.    Denial Was Justified Based on Disruption, Conflict and
Plaintiff's Lack of Candor....................................................22

II.    JARRARD ABANDONED HIS RELIGIOUS FREE EXERCISE
CLAIM, WHICH ALTERNATIVELY HAS NO MERIT AND IS
BARRED BY QUALIFIED IMMUNITY.................................24

III.    THE VOLUNTEER MINISTRY POLICY IS NOT SUBJECT TO
FIRST AMENDMENT "FORUM" ANALYSIS .......................26

IV.    IF THE COURT ENTERTAINS A FIRST AMENDMENT
"FORUM" CHALLENGE TO THE POLICIES, THE CHALLENGE
FAILS .......................................................................................29

V.    THE DISTRICT COURT CORRECTLY HELD THAT QUALIFIED
IMMUNITY PROTECTS DEFENDANTS..................................34

    A.    General Qualified Immunity Standards...............................34

    B.    Application of Qualified Immunity to Plaintiff's Claims.................35

        1.    Qualified Immunity Bars the Retaliation Claim......................35

        2.    Qualified Immunity Bars Any Policy-Based Individual
Claims.........................................................................37

VI.    THE DISTRICT COURT CORRECTLY REJECTED INJUNCTIVE
RELIEF......................................................................................38

CONCLUSION.....................................................................................40

CERTIFICATE OF COMPLIANCE.....................................................40

CERTIFICATE OF SERVICE..........................................................C-5

## <u>TABLE OF CITATIONS</u>

### <u>United States Supreme Court</u>

*Bd. of Cty. Comm'rs v. Umbehr,* 518 U.S. 668, 116 S. Ct. 2342 (1996) .....14

*Connick v. Myers,* 461 U.S. 138, 103 S. Ct. 1684 (1983)................17, 18, 19

*Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908)....................................39

*Garcetti v. Ceballos,* 547 U.S. 410, 126 S. Ct. 1951 (2006)...................15, 16

*International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U. S. 672, 112
  S. Ct. 2701 (1992)..............................................................................27

*Lane v. Franks*, 573 U.S. 228, 134 S. Ct. 2369 (2014)....................34, 36, 37

*Minn. Voters All. v. Mansky*, — U.S. —, 138 S. Ct. 1876 (2018)...............30

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S. Ct. 568
  (1977).................................................................................................23

*O'Lone v. Estate of Shabazz,* 482 U.S. 348, 107 S. Ct. 2400 (1987)............20

*Pell v. Procunier,* 417 U.S. 817, 94 S. Ct. 2800 (1974)...............................20

*Perry Educ. Ass'n v. Perry Loc. Educaturs' Ass'n,* 460 U.S. 37, 103 S. Ct.
  948 (1983)....................................................................................30, 34

*Pickering v. Board of Educ.,* 391 U.S. 563, 88 S. Ct. 1731 (1968)
  ....................................................................................................***passim***

*Plumhoff v. Rickard,* 572 U.S. 765, 134 S. Ct. 2012 (2014).......................35

*Preiser v. Newkirk,* 422 U.S. 395, 95 S. Ct. 2330 (1975).............................3

*Reichle v. Howards,* 566 U.S. 658, 132 S. Ct. 2088 (2012)..............25, 35, 37

*Saucier v. Katz,* 533 U.S. 194, 121 S. Ct. 2151 (2001)................................35

*Spomer v. Liittleton,* 414 U.S. 514, 94 S. Ct. 685 (1974)............................38

*Thomas v. Chicago Park Dist.,* 534 U.S. 316, 122 S. Ct. 775 (2002)...........30

*Turner v. Safley,* 482 U.S. 78, 107 S. Ct. 2254 (1987)................................20

*Waters v. Churchill,* 511 U.S. 661, 114 S. Ct. 1878 (1994)...................20, 23

**Eleventh Circuit Court of Appeals**

*Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253 (11th Cir. 2010) ......23

*Akins v. Fulton Cnty.*, 420 F.3d 1293 (11th Cir. 2005) .................................12

*Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017)..........27, 28

*Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011) ....................................31

*Boyce v. Andrew*, 510 F.3d 1333 (11th Cir. 2007) .......................................35

*Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991) ............................36

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n*, 942 F.3d 1215

(11th Cir. 2019) ..........................................................................29, 34

*Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194 (11th Cir. 2011) .......22, 23

*Echols v. Lawton*, 913 F.3d 1313  (11th Cir. 2019) ......................................34

*Gagliardi v. TJCV Land Tr.,* 889 F.3d 728  (11th Cir. 2018)..........................2

*Gaines v. Wardynski,* 871 F.3d 1203  (11th Cir. 2017) ................................36

*Gilmore v. Hodges,* 738 F.3d 266  (11th Cir. 2013)................................28, 35

*Jones v. Bank of Am., N.A.*, 564 F. App'x 432 (11th Cir. 2014) .......................

*Kurtz v. Vickrey*, 855 F.2d 723 (11th Cir. 1988) ...........................................17

*Maggio v. Sipple*, 211 F.3d 1346 (11th Cir. 2000) ........................................36

*Maisonet v. Comm'r, Ala. Dep't of Corr.,* No. 22-10023,

   2022 U.S. App. LEXIS 25976 (11th Cir. 2022)...................................25

*McKinley v. Kaplan,* 262 F.3d 1146 (11th Cir. 2001)...................................13

*Montoute v. Carr*, 114 F.3d 181 (11th Cir. 1997) .........................................34

*Morales v. Stierheim*, 848 F.2d 1145 (11th Cir. 1988)..................................19

*Morris v. Crow*, 142 F.3d 1379 (11th Cir. 1998) ..........................................17

*Moss v. City of Pembroke Pines,* 782 F.3d 613 (11th Cir. 2015) .................15

*Newman v. State of Ala.*, 683 F.2d 1312 (11th Cir. 1982).............................39

*Rodin v. City of Coral Springs,* 229 F.App'x 849 (11th Cir. 2007) .............13

*Seminole Tribe of Fla. v. State of Fla.*, 11 F.3d 1016 (11th Cir. 1994) .......39

*Walden v. CDC & Prevention*, 669 F.3d 1277 (11th Cir. 2012) ..................23

*Wilkerson v. Grinnell Corp.,* 270 F.3d 1314, 1322 (11th Cir. 2001).............24

*Williams v. Gwinnett Cty. Pub. Sch.,* 425 F.App'x 787 (11th Cir. 2011)..….17

## **Other Circuit Courts of Appeals**

*Barton v. Clancy,* 632 F.3d 9 (1st Cir. 2011)...............................................22

*Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986) .......................................15, 21

*Brown v. Polk County, Iowa*, 61 F.3d 650 (8th Cir. 1995) ...........................15

*Clark v. Holmes*, 474 F.2d 928 (7th Cir. 1972) .............................................19

*Daniels v. City of Arlington*, 246 F.3d 500 (5th Cir. 2001)...........................18

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,

    218 F.3d 337 (4th Cir. 2000) ........................................................13, 21

*Lumpkin v. Brown*, 109 F.3d 1498 (9th Cir.1997) ........................................15

*O'Malley v. Brierley,* 477 F.2d 785, 793 (3d Cir. 1973)...............................25

*Versarge v. Twp. of Clinton N.J.,* 984 F.2d 1359 (3rd Cir. 1993) .................13

*Ward v. Haskell,* No. 92-1868, 1993 U.S. App. LEXIS 4389

    (6th Cir. 1993).......................................................................................38

**United States District Courts**

*Akridge v. Wilkinson,* 351 F. Supp. 2d 750 (S.D. Ohio 2004) ...............16, 18

*Cochran v. City of Atlanta,* 150 F. Supp. 3d 1305 (N.D. Ga. 2015).............15

*Mathews v. City of S. Bend,*  No. 3:10cv390, 2013 U.S. Dist. LEXIS 69893

    (N.D. Ind. 2013).................................................................................13

*Mayfield v. City of Oakland,* No. C-07-0583 EMC,

    2007 U.S. Dist. LEXIS 59947 (N.D. Cal. 2007).................................13

*McDonald v. City of Pompano Beach, Fla.,*

    556 F. Supp. 3d 1334 (S.D. Fla. 2021).............................................29

*Montgomery v. Hugine*, No. 5:17-CV-1934-LCB, 2019 U.S. Dist. LEXIS 105564 (N.D. Ala. 2019)....................................................................39

*Mustapha v. Monken,* 2013 U.S. Dist. LEXIS 88775 (N.D. Ill. 2013).........13

*Smith v. Sch. Dist. of Philadelphia*, 158 F. Supp. 2D 599 (E.D. Pa. 2001). .13

**<u>Statutes, Regulations, Laws and Rules of Court</u>**

28 U.S.C. § 1291....................................................................................................1

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1) Whether the District Court correctly held that denial of a volunteer ministry application must be analyzed under the *Pickering* balancing test for First Amendment claims asserted by government employees, rather than under a "forum" analysis.

2) Whether the District Court correctly held that Plaintiff's teaching about baptism in the context of jail ministry was unprotected government employee speech rather than protected citizen speech.

3) Whether the District Court correctly held that Plaintiff's teaching about baptism in the context of jail ministry is not a matter of public concern.

4) Whether the District Court correctly held that Plaintiff abandoned any free exercise of religion claim.

5) Whether the District Court correctly held that qualified immunity protects Sheriff Moats and Defendant Sharp individually, where Plaintiff failed to identify any binding precedent that settled, beyond debate, that denial of the volunteer application or the volunteer application process violated Plaintiff's federally protected rights.

6)      Whether the District Court properly ruled that Plaintiff abandoned his equitable relief claims.

7)      Whether the District Court correctly rejected Plaintiff's equitable relief claims.

## STATEMENT OF THE CASE

### A.      Course of Proceedings

In broad terms Defendants agree with Plaintiff's statement regarding the course of proceedings. Defendants add the following to provide context.

The district court dismissed most of Plaintiff Jarrard's claims under a motion to dismiss. Intent on staying in Court, Plaintiff Jarrard manufactured new claims by re-applying for volunteer work in the Jail's inmate ministry program. Two applications were denied. Doc. 16-7 (May 6, 2020); Doc. 70-9 (March 9, 2022). The last Complaint asserted that Plaintiff Jarrard is aggrieved by the Sheriff's Office's decision to deny his application to be a volunteer minister at the Jail. Doc. 53 at Count 2. Plaintiff also challenged the latest volunteer ministry policy adopted in 2021. Doc. 53 at Count 3.

Eventually Jarrard withdrew his equitable relief claim against the jail ministry application policy based on mootness. Doc. 68. The same ground required dismissal of the declaratory judgment claim. *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 735 (11th Cir. 2018) (a "declaratory judgment devoid of

'sufficient immediacy and reality' cannot render a case justiciable." (quoting *Preiser v. Newkirk*, 422 U.S. 395, 402, 95 S. Ct. 2330 (1975)).

Also, Jarrard did not challenge the bar to damages posed by the Eleventh Amendment in regard to official capacity claims. After discovery and briefing, the district court granted summary judgment against Jarrard.

### B. <u>Statement of Facts</u>

### Background

Sheriff Johnny Moats was first elected to the office of Polk County Sheriff in 2012. Doc. 61 (Moats Dep.) at 10. At the times relevant to this case, Defendant Al Sharp was the Administrator over the Polk County Jail.

The Polk County Jail is operated by the Polk County Sheriff's Office. Doc. 61 (Moats Dep.) at 12, 17, 21. The Jail inmate population commonly has between 150 and 190 inmates. Doc. 61 (Moats Dep.) at 12. Most of the inmates are pretrial detainees. Doc. 61 (Moats Dep.) at 12-13.

Mr. Jarrard's claims arise from his exclusion from the Sheriff's Office jail ministry program, aspects of which the District Court summarized as follows:

> The Sheriff's Office application form refers to jail ministry as "volunteer work." (Dkt. 60-1 at 1, 3; *see also* Dkt. 70 ¶ 43 (Plaintiff accepting this characterization).) It notes applicants can be "terminat[ed]" once "hired." (Dkt. 60-1 at 5.) It requires applicants to sign the same confidentiality agreement as employees. (Id. at 19.) And it requires applicants to sign other employment-like forms, including a waiver of liability and a criminal history check. (Id. at 18, 20.) The Sheriff's Office also "hired" a lead jail

3

minister, gave him "staff," put him in charge of volunteer ministers, and gave him authority to terminate those ministers. (Dkts. 60 at 87, 155; 61 at 28; 62 at 19.)

Doc. 75 at 21-22.

### Plaintiff Jarrard's Conflicted Jail Ministry History [1]

Mr. Jarrard's usual jail ministry meeting format consists of a Bible study rather than a traditional worship service. Jarrard Dep. at 29-32. His volunteer status has been terminated in at least four local jail facilities, including in Polk County.

Mr. Jarrard's first jail ministry was at **Cobb County** Detention Center, and it lasted 10 months. Jarrard Dep. at 16. Plaintiff says he quit after conflicts with the jail ministry coordinator. Jarrard Dep. at 19. Next, Mr. Jarrard was terminated from jail ministry at the **Paulding County** Detention Center in approximately 2011. Jarrard Dep. at 22.

Likewise, some time before 2013 under a different Polk County Sheriff, Plaintiff Jarrard was terminated from the **Polk County** Sheriff's Office volunteer ministry program. Jarrard Dep. at 36, 86; Doc. 61 (Moats Dep.) at 41.

In approximately 2018, Jarrard was terminated from ministry at the **Floyd County** Detention Center over a dispute relating to baptism. Jarrard Dep. at 27.

---

[1] Mr. Jarrard insists that he is not a "reverend," so that title is not used in this Brief. Jarrard Dep. at 5 ("Reverend won't work."). No disrespect is intended.

**Details Surrounding Jarrard's Actions at Polk County Jail**

After Sheriff Moats was elected, Mr. Jarrard was re-admitted to jail ministry at the Polk County Jail. Jarrard Dep. at 37-38, 44; Doc. 61 (Moats Dep.) at 41. After that, the head of the Polk County Jail's ministry program expressed to the Sheriff's administration "a bunch of concerns about Mr. Jarrard upsetting his staff and upsetting a lot of inmates in our jail. [H]e said that several of the other preachers in jail refused to go into the same pod as Mr. Jarrard because of his behavior … ." Doc. 61 (Moats Dep.) at 27.

Sheriff Moats understood that Mr. Jarrard "gets real confrontational [about theological differences], and instead of just moving on from it, … he just keeps pushing and pushing and pushing. That's why he was disrupting my [ministry] staff that I had in place for years and was working in the jail and disrupting our inmates." Doc. 61 (Moats Dep.) at 29-30.

Sheriff Moats understood part of the dispute centered on the inmate ministry program's philosophy that the volunteers were supposed to be helping inmates rather than agitating them, and Jarrard's conduct conflicted with that orientation. Doc. 61 (Moats Dep.) at 36:10-24; 38:2-8. Sheriff Moats understood that Mr. Jarrard refused to adhere to that basic tenet of the jail ministry program. Doc. 61 (Moats Dep.) at 45:8-16.

Sheriff Moats was concerned because Jarrard's teaching stirred up inmates

by making them distraught due to his claim they had to be full-immersion baptized to avoid going to Hell. Doc. 61 (Moats Dep.) at 30, 31, 34-35, 39:9-16.

The Sheriff's Office wanted the program to help inmates rather than agitate them, and Mr. Jarrard was producing agitated inmates and disruption of the ministry program. Doc. 61 (Moats Dep.) at 30, 35, 44:2-3. Jarrard says that he was once again again terminated from the Polk County Jail ministry program in December 2016. Jarrard Dep. at 45:14-17.[2]

### Plaintiff Jarrard's Post-Lawsuit Jail Ministry Applications

In March 2020, the Sheriff's Office adopted policy 5.23 which states in part:

> Clergymen and religious advisors wishing to hold services or conduct programs in the jail must make written application to the Polk County Sheriff's Office with supporting documentation**,** attend a training session and then be approved by the Jail Administrator.

Doc. 53-2 at 3 (subsection F).

The application form provides various criteria for qualification to the volunteer ministry and rules governing the program. Doc. 53-8 (Jarrard's April 2020 application).

After filing this lawsuit but having practically all claims dismissed, Mr. Jarrard applied again for volunteer work in the Polk County Sheriff's Office jail

---

[2]  Jarrard sued about the 2016 termination but the district court found the claim was time-barred, a ruling that is not challenged on appeal.

ministry program. Doc. 53 at ¶42 & Doc. 58-3. After investigating Mr. Jarrard's history at other facilities and in Polk County, Sheriff Moats and Chief Sharp learned Jarrard has a history of being at the center of disruption and religious disputes at other facilities, similar to his history in Polk County. Doc. 61 (Moats Dep.) at 27, 29-30, 42; Doc. 62 (Sharp Dep.) at 51-52.

Specifically, Sheriff Moats called the sheriffs of Floyd County and Paulding County, both of whom indicated that Plaintiff Jarrard had been ejected from jail ministries at both places due to causing disruption. Doc. 61 (Moats Dep.) at 42:13-22. Based on a call to the Cobb County Sheriff's Office, similar information emerged about Plaintiff Jarrard's disruptive history. Doc. 61 (Moats Dep.) at 42-43; Doc. 62 (Sharp Dep.) at 51-52.

The Sheriff's Office is interested in preventing controversy in the jail, and the Sheriff's Office administration believes Jarrard has a history of promoting conflicts. Doc. 61 (Moats Dep.) at 30-31, 43; Doc. 62 (Sharp Dep.) at 19, 42-43. The Sheriff's Office denied Jarrard's 2020 application in part based on Plaintiff's history of conflict in the course of jail ministry in Polk County and other facilities. Doc. 61 (Moats Dep.) at 42, 44:4-13; Doc. 62 (Sharp Dep.) at 52:9-24, 56:8-17; Doc. 53-9.

Also, the Sheriff's Office investigation revealed Plaintiff's application did not indicate the true nature of his dismissal from jail ministry at other facilities.

Doc. 61 (Moats Dep.) at 44:4-19; Doc. 62 (Sharp Dep.) at 51-52; Doc. 53-9.

Sheriff Moats and Chief Sharp concluded that information from an outside

agency(s) conflicted with information from Mr. Jarrard's application, which cast

doubt on the application's truthfulness. Doc. 61 (Moats Dep.) at 44:9-20, 46:9-

12, 48:22-25-49:1-10; Doc. 62 (Sharp Dep.) at 51-52.

Specifically, Jarrard's application indicated he left the Paulding County

program due to being "rotated out," whereas the Paulding County Sheriff

indicated Plaintiff had been banned for disruptive behavior. Doc. 61 (Moats

Dep.) at 47:7-16. Lack of truthfulness in an application is a disqualifier for all

Sheriff's Office positions, whether employment or the volunteer ministry

program. Doc. 61 (Moats Dep.) at 44:14-19, 46:14-16. Jarrard's application was

denied.

Mr. Jarrard asserted that his volunteer ministry application for the Polk

County Jail was denied solely due to his teaching on baptism and not for any

other expression such as his protest in front of the jail. Doc. 60 (Jarrard Dep.) at

74, 123:4-11.

### Revision of the Policy and Plaintiff's 2021 Application

In 2021, the Sheriff's Office adopted a new policy governing admission of

volunteer clergy to minister to inmates at the Polk County Jail. Doc. 53-5 at 3.

The latest complaint raises a challenge to the following current policy and

8

(presumably) its implementing regulations:

> The Polk County Sheriff's Office encourages Clergy from the community to minister to the inmates. Clergymen and religious advisors wishing to hold services or conduct programs in the jail must submit a volunteer application. Members of the clergy allowed within the inner security perimeter or allowed contact visitation, must complete background checks, including the jail ministry program[.]

Doc. 53-5 at 3 (section 7.07.16).

The application form for the volunteer ministry program details various minimum qualifications for volunteer jail ministry, including verification of basic ministry credentials, criminal history check and other items. Doc. 62 (Sharp Dep.) at 34-35, Doc. 53-10 (Jarrard 2021 application). Volunteer ministry requires completion of a safety-related course that focuses upon how to act in a jail setting. In order to preserve standing and avoid mootness due to adoption of a new policy, Plaintiff Jarrard submitted yet another application in 2021. Doc. 60 (Jarrard Dep.) at 126-127; Doc. 53-10 (Jarrard 2021 application).

The Sheriff's Office jail ministry program was shut down for most of 2020 and 2021 due to the Covid-19 pandemic. Doc. 62 (Sharp Dep.) at 59-60; Exhibit 1 (Counsel letter about Jarrard application); Doc. 61 (Moats Dep.) at 78:7-10. Accordingly, the Sheriff's Office did not taken action on Jarrard's latest application until March 9, 2022. Doc. 70-9 (denial notice).

### Sheriff Moats' Letter to the Attorney

Jarrard's most oft-repeated "evidence" consists of a 2019 letter from Sheriff Moats to Jarrard's attorney, where Sheriff Moats responded to the attorney's demands and claims. While Jarrard prefers to highlight the doctrinal discussion in the letter, he completely ignores that the letter says this at the very beginning:

> Stephen Jarrard was barred from the Polk County Jail, not because of his insistence on baptizing inmates, but because of his disruptive behavior toward other members of the jail ministry program that did not share his radical religious views. He was verbally abusive and argumentative, challenging the denominational belifs of the other jail ministry personnel in the presence of the inmates and causing doubt and confusion among those he was attempting to convert.

Doc. 16-4.

In the letter Sheriff Moats explained he was discussing the baptism issue because it "was part of [the attorney's] assertions." *Id*. Sheriff Moats has a different theological perspective from Jarrard, but that is hardly remarkable. It is certainly not a basis for a federal lawsuit.

### STANDARD OF REVIEW

The District Court's order granting summary judgment is reviewed *de novo*.

### SUMMARY OF ARGUMENT

The District Court's thorough order granting summary judgment should be affirmed. Jarrard's First Amendment retaliation claim is correctly analyzed under

the Pickerning balancing test because he applied for a volunteer position that is analogous to public employment. Jarrard's claimed basis for retaliation—his teaching about baptism—would be proclaimed in the course of a government program is would thus be nonprotected speech.

Moreover, Jarrard's teaching about baptism is not a matter of public concern as that term has been defined by the courts. Additionally, the Sheriff's Office interest in reasonable administration of the volunteer ministry program and inmate conditions of confinement outweigh Jarrard's interest in proclaiming his view that persons who are not full-immersion baptized are doomed to Hell. Finally, Jarrard's application was denied due to his history of personal conflicts and lack of candor in his volunteer application, not due to his religious doctrine.

The District Court correctly rejected application of First Amendment "forum" analysis to the volunteer ministry program vetting procedures, since the policies governing volunteer ministry are more analogous to a hiring process than to any type of First Amendment "forum." The jail ministry is a program for inmates, not a "forum" open for expression of speech.

Regardless of Jarrard's arguments, he has failed to show that Defendants violated his clearly established rights. To overcome qualified immunity Jarrard must show that his rights were established "beyond debate," but here all of the established law favors Defendants. Consequently, the District Court properly

concluded that Defendants are entitled to summary judgment. Defendants respectfully request this Court to affirm.

## ARGUMENT AND CITATIONS TO AUTHORITY

The District Court's order distilled the voluminous record and properly applied the Court's precedent to this case. As discussed below, qualified immunity bars Mr. Jarrard's claims, and the District Court properly held that Plaintiff has no viable injunctive relief claim against Sheriff Moats in his official capacity.

## I.    PLAINTIFF'S CLAIM BASED ON DENIAL OF HIS VOLUNTEER APPLICATION FAILS

Plaintiff claims that his volunteer ministry application was denied solely due to his religious view about baptism.[3] A prima facie case of First Amendment retaliation requires a claimant to demonstrate: (1) he engaged in a constitutionally protected activity; (2) he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a "substantial" or "motivating factor" in the adverse action. *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1303 (11th Cir. 2005). Plaintiff's claim arises out of denial of volunteer status by a public entity, so it is governed under standards developed by the Supreme Court in *Pickering v. Board*

---

[3]    Doc. 53 at ¶77. Jarrard does not claim that his lawsuit or protest or any other expression was a motive for retaliation. Doc. 60 (Jarrard Dep.) at 123:4-11.

*of Educ.*, 391 U.S. 563, 88 S. Ct. 1731 (1968), and other precedents that elaborate on *Pickering*.

Plaintiff contests that his claim should be analyzed under *Pickering* and its progeny. But substantial authority holds that retaliation claims by government volunteers are governed by the same standards as retaliation claims by government employees. See *Rodin v. City of Coral Springs*, 229 Fed. Appx. 849, 851 (11th Cir. 2007) (analyzing volunteer firefighter's First Amendment claim under *Pickering* test);  *McKinley v. Kaplan,* 262 F.3d 1146, 1150 n.5 (11th Cir. 2001) (applying *Pickering* to claim by unpaid political appointee and stating "courts have extended the application of the *Pickering* analysis to cover more than just traditional public employees."); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 351 (4th Cir. 2000)(same); *Versarge v. Twp. of Clinton N.J.*, 984 F.2d 1359, 1364 (3d Cir. 1993)(same).

District courts have taken the same basic course, even specifically for volunteer chaplains in government programs. *Mustapha v. Monken,* 2013 U.S. Dist. LEXIS 88775, at *16-17 (N.D. Ill. 2013) (volunteer police chaplain); *Mathews v. City of S. Bend*, No. 3:10cv390, 2013 U.S. Dist. LEXIS 69893, at 19 (N.D. Ind. 2013) (applying *Pickering* to denial of volunteer position with public entity's law department); *Mayfield v. City of Oakland*, No. C-07-0583 EMC, 2007 U.S. Dist. LEXIS 59947, at *11-12 (N.D. Cal. 2007) (applying *Pickering*

tests to police chaplains claiming retaliatory dismissal); *Smith v. Sch. Dist. of Philadelphia*, 158 F. Supp. 2d 599, 606 (E.D. Pa. 2001)(applying public employment tests to volunteer with school). The Supreme Court also has applied these standard to independent contractors. *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 116 S. Ct. 2342 (1996).

Two points follow from this line of authority. First, the great weight of authority indicates that *Pickering* balancing must be applied to Jarrard's First Amendment retaliation claim. Second, for the purpose of qualified immunity, clearly established law points toward application of *Pickering* and its progeny rather than some other body of law.

The Court summarizes the usual free speech analysis in the government employment context as follows:[4]

> First, we consider whether Plaintiff's speech was made as a citizen and whether it implicated a matter of public concern. If this first threshold requirement is satisfied, we then weigh Plaintiff's First Amendment interests against the [government's] interest in regulating his speech to promote the efficiency of the public services it performs through its employees. The above two issues are questions of law that are decided by the court. The court's resolution determines whether Plaintiff's speech is protected by the First Amendment.
>
> If his speech is so protected, the third stage of the analysis requires

---

[4]    Plaintiff may protest that he intended to be a volunteer rather than a public employee, but the case law uses "employee" and "employer" language for the prototypical case. There is no point in changing the language of the case law, since the substantive legal standards remain the same regardless of vocabulary.

> Plaintiff to show that it was a substantial motivating factor in his termination. If Plaintiff is able to make this showing, the burden shifts to the [government] to prove that it would have [taken the same action] even in the absence of [plaintiff's] speech.

*Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015) (alterations supplied; citations and quotations omitted). The same analysis applies to speech or belief that happens to be religious. See *Lumpkin v. Brown*, 109 F.3d 1498, 1500-01 (9th Cir. 1997); *Brown v. Polk County, Iowa*, 61 F.3d 650, 658 (8th Cir. 1995) (*en banc*); *Baz v. Walters*, 782 F.2d 701, 708 (7th Cir. 1986); *Cochran v. City of Atlanta*, 150 F. Supp. 3d 1305, 1312 (N.D. Ga. 2015).

For purposes of the following discussion (with the exception of the "substantial factor" element), Defendants analyze at face value Plaintiff's contention that his volunteer application was denied on the basis of his religious speech or view. As will be seen, even under that counterfactual assumption the District Court correctly granted summary judgment.

### A.    Plaintiff's Communications in Jail Ministry Were Not as a Citizen

In *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006), the Supreme Court explained that the line between speaking as a citizen or as a public employee turns on whether the speech "owes its existence to a public employee's professional responsibilities." *Id.* at 421-22. If so, then "[r]estricting [it] ... does not infringe any liberties the employee might have enjoyed as a private citizen. It

simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id*.

Here, Plaintiff's particular speech about baptismal doctrine occurred (or would occur in the future) in the context of jail ministry as part of a Sheriff's Office program to provide support services to inmates in the Jail. See Doc. 75 at 26 (District Court's analysis explaining that Plaintiff's teaching to inmates about baptism owed its existence to his volunteer function). Therefore, the only reason Plaintiff would be speaking to inmates about his view of baptism would be as part of the work he signed up to perform at the Jail.

That work is explicitly supposed to involve communication of religious content to inmates in the jail. Thus under the *Garcetti* test, Plaintiff's speech about baptism to inmates would "owe[] its existence to [plaintiff's] professional responsibilities." *Id.* at 421-22; see also *Akridge v. Wilkinson*, 351 F. Supp. 2d 750, 762 (S.D. Ohio 2004) (finding that jail chaplain's dispute with administration about religious point was an internal matter about his job rather than one of public concern). Consequently, Plaintiff's speech about baptism would be expressed as a volunteer in a government program rather than as a citizen, and the First Amendment does not protect that type of speech. *Garcetti*, 547 U.S. at 421-22. The district court correctly dismissed Jarrard's First Amendment retaliation claim on this ground.

16

**B.    Plaintiff's Baptism Communications Involve Personal Religious Views, Not Matters of Public Concern**

To prevail on a claim of retaliation for protected speech, an employee must establish that the purpose of [his] speech was to raise issues of public concern, which can **be discerned from the content of the speech, the audience to whom the speech is delivered, and the motivation of the speaker**.

*Williams v. Gwinnett Cty. Pub. Sch.*, 425 F. App'x 787, 789-90 (11th Cir. 2011) (emphases supplied; citations and internal punctuation omitted). Other relevant factors are the **context and form** of the speech. *Connick*, 461 U.S. at 147-48. "The fact that [] information may be of general interest to the public ... does not alone make it of 'public concern' for First Amendment purposes." *Morris v. Crow*, 142 F.3d 1379, 1381 (11th Cir. 1998); *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir.1988).

The District Court found Plaintiff's presentation on this point, which consisted of an "argument ... only one sentence long [with] no citations to evidence or authority" (Doc. 75 at 30), was insufficient to contest the point. That holding should end this inquiry.

Alternatively, Plaintiff's baptism and salvation views—which he claims are the basis for denial of his volunteer application—are not matters of public concern. In terms of context, form, and audience, Plaintiff's communication about baptism would be expressed orally in a local jail to inmates, who

17

voluntarily listen during a designated time for religious discussion. The non-public nature of Plaintiff's communication in a highly restricted setting cuts against a finding of "public concern." As for Plaintiff's purpose, the point of baptism speech is to tell inmates about a particular doctrinal point. The content of that doctrine is that (according to Plaintiff) full immersion baptism is a condition to eternal salvation, absent which every human being is damned to Hell.

It should be evident that, regardless of the importance that Plaintiff (or anyone else) may attach to Plaintiff's baptism doctrine and/or view of Biblical soteriology, it is not a matter of "public concern" as that phrase has been defined in the First Amendment *Connick-Pickering* context. Doc. 75 at 31-32 (District Court's public concern analysis). Put differently, many people care about religious beliefs, but any given person's religious belief is not a matter of "public concern." See *Daniels v. City of Arlington*, 246 F.3d 500, 504 (5th Cir. 2001) ("Visibly wearing a cross pin ... obviously is a matter of great concern to many members of the public, [but] in this case it simply is not a matter of "public concern" as that term of art has been used in the constitutional sense."); *Akridge v. Wilkinson,* 351 F. Supp. 2d 750, 762 (S.D. Ohio 2004) (jail chaplain's "personal opinions on whether the Protestant faith condemns homosexuality as a sin ... do not constitute matters of public concern."). For this additional reason the District Court correctly granted summary judgment on Count 2.

18

**C.    The Sheriff's Office Interest in Peaceful and Efficient Jail Administration Outweigh Plaintiff's Interest in Espousing His View of Baptism to Inmates**

If a communication is properly considered a matter of public concern by the plaintiff speaking as a citizen, courts balance "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Morales v. Stierheim*, 848 F.2d 1145, 1149 (11ᵗʰ Cir. 1988). To further the purpose of effective and efficient public service,

> the Government … must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency. … [Employers are not required] to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.

*Connick v. Myers*, 461 U.S. 138, 151, 152, 103 S. Ct. 1684 (1983).

"First Amendment rights must be applied in light of the special characteristics of the environment in a particular case." *Clark v. Holmes*, 474 F.2d 928, 931 (7ᵗʰ Cir. 1972). Here the environment is a local jail, where harmony, order and inmate discipline are of paramount concern.[5] For that reason

---

[5]    *Cygan v. Wis. Dep't of Corr.*, 388 F.3d 1092, 1101 (7ᵗʰ Cir. 2004) (holding that the "time, place, and manner of [correction officer's] speech and its potential disruptiveness weigh heavily against her. … GBCI, as a correctional

the Supreme Court has long demanded judicial deference on questions about internal jail operations.[6]

Where a volunteer is supposed to "contribute to an agency's effective operation [but instead] begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain [him]." *Waters v. Churchill*, 511 U.S. 661, 675, 114 S. Ct. 1878 (1994) (plurality opinion). Here, Plaintiff adversely impacted jail administration for two reasons. First, Plaintiff consistently could not get along with other jail ministers. This was the case at the Polk County Jail and it happened at other jails too. Second,

_____

facility, has a very strong interest in maintaining order and control over inmates… ."); *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) (maintaining employer's efficiency, integrity and discipline is highly protected for "Police ... because they are 'paramilitary'—discipline is demanded, and freedom must be correspondingly denied."); *Jackson v. Bair*, 851 F.2d 714, 722 (4th Cir. 1988), *opinion withdrawn due to en banc consideration*, 863 F.2d 1162 ("The district court rightly considered that employment in the prison context presents special considerations favoring the public employer in the balancing process.").

   [6]   *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353, 107 S. Ct. 2400, 2407 (1987) ("We ... reaffirm our refusal ... to substitute our judgment on … difficult and sensitive matters of institutional administration, [cite] for the determinations of those charged with the formidable task of running a prison." (cleaned up)); *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254 (1987) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."); *Pell v. Procunier*, 417 U.S. 817, 827, 94 S. Ct. 2800, 2806 (1974) (stating "the institutional objectives furthered by [the] regulation and the measure of judicial deference owed to corrections officials in their attempt to serve those interests are relevant in gauging the validity of the regulation.").

Plaintiff preached to the inmates that they were damned to Hell if they died without being baptized in his prescribed manner (full immersion). Predictably this produced numerous upset inmates, which is highly undesirable to jail administrators and cut against the very point of the volunteer religious ministry program.

Plaintiff's conduct adversely affected the overall jail ministry program, adversely affected inmates, and ran counter to the point of the jail ministry. Plaintiff had conflicts with other ministers, agitated inmates, provided distractions to the administration and made jail administration more difficult. The Sheriff's weighty interests in effective and efficient jail management far outweighed Plaintiff's First Amendment interest in espousing his particular theological views to inmates. See *Baz v. Walters*, 782 F.2d 701, 708 (7th Cir. 1986) (rejecting minister's claim where his "religious activities ... were detrimental to the best interests of the patients and to the general maintenance of order at the hospital.").

### D.    Volunteer Jail Ministry Is Not Clearly Established as a Government Benefit

To prevail Plaintiff "must establish … that he was deprived of a valuable government benefit or adversely affected in a manner that … would tend to chill his exercise of First Amendment rights." *Goldstein v. Chestnut Ridge Volunteer*

*Fire Co.*, 218 F.3d 337, 352 (4ᵗʰ Cir. 2000). The record does not support any

"chill" of First Amendment rights. As for a benefit, Plaintiff seemingly viewed

inclusion in the volunteer ministry program as valuable, but objectively that is

not at all clear. For the purpose of qualified immunity (see § III below), the Court

has not clearly established that volunteer jail ministry is a government "benefit"

protected by the First Amendment. *Barton v. Clancy*, 632 F.3d 9, 27 (1ˢᵗ Cir.

2011) (granting qualified immunity where "Neither this circuit nor the Supreme

Court has resolved the basic question of whether an unpaid volunteer position is a

valuable government benefit, the deprivation of which can trigger First

Amendment scrutiny."). That lack of clarity in the law favors qualified immunity.

### E. Denial Was Justified Based on Disruption, Conflict and Plaintiff's Lack of Candor

"In order to establish a causal connection, the plaintiff must show that the

defendant was subjectively motivated to take the adverse action because of the

protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11ᵗʰ

Cir. 2011). At this point Defendants stop pretending that Plaintiff's jail

application was denied based on his baptism teaching. The real reasons are that

(1) Plaintiff has a history of disrupting jail operations through conflict with other

people, and (2) Plaintiff's volunteer application lacked candor about that fact. As

for Plaintiff's final application—filed only to preserve his claim after a policy

change—the ministry program was shut down for an extended time due to the Covid-19 pandemic. Nobody was admitted for jail ministry, and Jarrard's litigation-generated application for a nonfunctioning program cannot ground a "retaliation" claim.

Courts decide the "subjective motivation issue" using the burden-shifting formula in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568 (1977). If "the plaintiff shows that [his] protected conduct was a motivating factor, the burden shifts to the defendant to show that [he] would have taken the same action in the absence of the protected conduct, in which case the defendant cannot be held liable." *Castle*, 631 F.3d at 1197.

When considering the Defendant's motivation the Court is required to credit "the facts as the employer reasonably found them to be." *Waters v. Churchill*, 511 U.S. 661, 677, 114 S. Ct. 1878 (1994). "[W]hen there are conflicting accounts of the employee's speech or conduct, the court should consider the employee's behavior as the government believed it to be, so long as that belief was reasonable." *Walden v. CDC & Prevention*, 669 F.3d 1277, 1288 (11th Cir. 2012); see also *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").

Here, Sheriff Moats and Chief Sharp were personally familiar with Plaintiff's history of disruption and conflict at the Polk County Jail. Discussion with other jail administrators yielded the conclusion that Plaintiff's record was similar in other jails. Plaintiff's application did not disclose those facts. Those are the real bases for the denial decision, and of course they provide no ground for a First Amendment claim. Likewise, Plaintiff's latest application was simply part of his legal strategy and, even if regarded as a legitimate application on a changed set of facts, there was no point in a decision until the jail ministry resumed.

## II.  JARRARD ABANDONED HIS RELIGIOUS FREE EXERCISE CLAIM, WHICH ALTERNATIVELY HAS NO MERIT AND IS BARRED BY QUALIFIED IMMUNITY

Jarrard asserts on appeal that the District Court erred in failing to recognize or separately rule upon a free exercise of religion claim. But the District Court expressly considered that type of claim, holding it abandoned by Jarrard's failure to argue the claim in response to summary judgment. "Plaintiff has abandoned any claim for free exercise retaliation that is not otherwise barred by the Court's adjudication of his free speech claim." Doc. 75 at 36 n. 15. See *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (finding abandonment where claim was not defended against summary judgment motion); *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned,

and affirming grant of summary judgment, as to claim presented in complaint but not defended in response to motion for summary judgment). It is too late now to argue a free exercise claim, and the District Court's ruling should be affirmed.

Aside from abandonment, Jarrard has no constitutional right to religious exercise specifically inside a jail where he is not an inmate. See *O'Malley v. Brierley*, 477 F.2d 785, 793 (3d Cir. 1973) (holding clergy have no First Amendment free exercise right to enter prison for ministry). Aside from inmate visits (which were never restricted or regulated in terms of religious exercise), the only reason Jarrard would ever have any business exercising his religion inside the jail would be in the context of volunteer ministry, and the District Court squarely considered Jarrard's claim about exclusion from volunteer ministry.

Finally, if Jarrard had any right to free exercise of his religion inside the Polk County Jail, it was not clearly established "beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088 (2012); *Maisonet v. Comm'r, Ala. Dep't of Corr.*, No. 22-10023, 2022 U.S. App. LEXIS 25976, *10 (11th Cir. 2022) (holding qualified immunity barred cleric's free exercise claim about right to minister to death row inmates). Consequently, qualified immunity disposes of Jarrard's free exercise claim—had it not been abandoned in the District Court.

## III. THE VOLUNTEER MINISTRY POLICY IS NOT SUBJECT TO FIRST AMENDMENT "FORUM" ANALYSIS

The operative complaint contends that the policy providing for volunteer ministry (including the application form) violates the First Amendment due to "no standards for the exercise of any discretion, and no time limits for decision-making," with rules that are "vague, overbroad, and amount to viewpoint discrimination." Doc. 53 at ¶¶87-88. Plaintiff conceives of jail ministry as some type of First Amendment "forum," because that is the only context where his contentions make any sense.

In regard to whether the jail volunteer ministry program is a First Amendment "forum," Jarrard previously agreed that he has "no right to involvement in Jail activities or access to provide religious services to inmates at the Jail." Doc. 23 at 2. That means the jail ministry is not a First Amendment forum, because a necessary precondition for a forum is the right to exercise some First Amendment expression in the "forum."

As should be plain from the extensive analysis in § I above, jail ministry at the Polk County Jail is not any type of "forum" for First Amendment purposes. Rather,  it is a government program designed to provide a service to incarcerated inmates through vetted volunteers. Technically volunteer work is not employment, but First Amendment jurisprudence treats it that way.

Conspicuously absent from all "forum" cases is an employer-employee relationship, or a government-volunteer relationship.

Therefore, it is a serious error to apply rules of a "public forum" to the application and screening process in place for volunteer ministry. The correct analogy is a hiring process, not regulation of speech in a publicly available facility.[7] The proper body of law for this case arises from government employment, as detailed in § I above. It follows that the Sheriff's Office's ordinary volunteer application and decision process is not subject to such doctrines as "vagueness" and "unbridled discretion," etc. The First Amendment simply does not regulate hiring procedures or policies except to the extent detailed in section I above.[8]

The "public forum" analysis may have a superficial appeal here because participation in the jail ministry program involves talking to inmates at a government facility. However, many government enterprises and positions involve talking to groups of people at government facilities. Judges, teachers, drill sergeants, politicians and many others must address given audiences as part

_____

[7]    *Cf. International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U. S. 672, 678, 112 S. Ct. 2701 (1992) (explaining the court's "forum based approach for assessing restrictions that the government seeks to place on the *use of its property*." (emphasis supplied)).

[8]    Specifically the First Amendment prohibits use of certain types of qualifiers or disqualifiers for public employment or benefits.

of a government program. These jobs are not thereby "forums" regulated by the First Amendment. Likewise, there is no basis for claiming that the vetting/hiring process used to select persons for these jobs is subject to First Amendment doctrines like "overbreadth" or "unbridled discretion."

Plaintiff's primary case is *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017), where the forum was a public school board meeting that was open for public comment. The plaintiff in *Barrett* was not applying for some government position, he had a *right* to participate in the meeting, and the permitting process was supposed to serve the purpose of orderly administration rather than the purpose of censorship.

By contrast, here there is no public meeting, no right to access, and no invitation for public comment. This case concerns entry to a volunteer ministry program in support of services to jail inmates. Nothing in *Barrett* would tell a reasonable jail administrator that the vetting rules for the jail's volunteer program were subject to First Amendment "forum" analysis.

The Court has "stated time and again that 'officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.'" *Gilmore v. Hodges*, 738 F.3d 266, 278 (11th Cir.2013). Only by great leaps of legal imagination can this case be shoe-horned into a "forum" mold. Because the shoe doesn't fit, the District Court correctly rejected "forum" analysis and held

that qualified immunity entitles Defendants to summary judgment.

## IV.  IF THE COURT ENTERTAINS A FIRST AMENDMENT "FORUM" CHALLENGE TO THE POLICIES, THE CHALLENGE  FAILS

Jarrard argues that, contrary to the previous sections, Polk County Jail inmate ministry is a "forum" and the application process is really a "permitting" scheme required for entry to the "forum." The District Court correctly refused to apply "forum" analysis to what is functionally a government employment context. However, in the event the Court chooses to entertain Plaintiff's view, the following analysis would apply. Initially, for purposes of this discussion the challenged policies are largely identical.

"Forum" jurisprudence is helpfully summarized in *Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n*, 942 F.3d 1215 (11th Cir. 2019). Cutting to the chase for present purposes:

> [A] nonpublic forum is a government space that is not by tradition or designation a forum for public communication. A space where the state is acting only as a proprietor, managing its internal operations, falls into this category. Examples include polling places, the mailboxes of public school teachers, terminals in publicly operated airports, and military bases.

*Cambridge Christian Sch., Inc.*, 942 F.3d at 1237 (citations and internal punctuation omitted)(finding a nonpublic forum where stadium loudspeaker system was only open to very limited set of speakers on specific occasions).

Here, the inmate housing area of the jail is not open to the public and the

Sheriff's Office never intended the jail ministry program to provide a "forum" for anyone. So, if it is a "forum" at all, the jail ministry could only be a "nonpublic forum." See *Cambridge Christian Sch., Inc.*, 942 F.3d at 1238.; *McDonald v. City of Pompano Beach, Fla.*, 556 F. Supp. 3d 1334, 1352 (S.D. Fla. 2021) (noting jails are nonpublic forums). With the exception of viewpoint discrimination, regulations governing a nonpublic forum are upheld if they are "reasonable in light of the purpose served by the forum." *Minn. Voters All. v. Mansky*, — U.S. —, 138 S. Ct. 1876, 1886 (2018).

Highly relevant to this case, some would-be speakers can be excluded to keep the peace. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 52, 103 S. Ct. 948, 959 (1983) ("exclusion of the rival union may reasonably be considered a means of insuring labor-peace within the schools. The policy serves to prevent ... schools from becoming a battlefield for inter-union squabbles."). That laudatory goal is particularly crucial in a jail setting, and it is one of the two reasons Plaintiff's application was denied. Of course lack of candor is also a legitimate reason for denial.

Moving to the idea of "unbridled discretion," this doctrine applies to permitting processes, wherein some interested person asks the government for a license to use its facility. See *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323, 122 S. Ct. 775 (2002) ("Where the licensing official enjoys unduly broad

discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content."). This case does not feature a permitting process, and Plaintiff was not seeking to use government property—at least not in any sense that Defendants would recognize. Rather, Plaintiff sought volunteer status in a Sheriff's Office program designed to serve inmates on a recurrent basis. Use of jail facilities was merely incidental, because that is where the inmates are incarcerated.

Yet assuming for the sake of argument that the volunteer vetting process is a "permit" issuance scheme, then "permit requirements should contain narrowly drawn, reasonable and definite standards to guide the official's decision." *Bloedorn v. Grube*, 631 F.3d 1218, 1236 (11th Cir. 2011). Here, the Sheriff's Office used a detailed application form that provides specific criteria for jail ministry volunteers. Doc. 53-10. It spells out specific rules like "don't argue with inmates or other volunteers." Doc. 53-10 at 4 (item 12). The Sheriff's Office decision on Jarrard's application turned on his particular track record of controversy, together with lack of candor in the application.

The First Amendment does not require a government agency to spell out that an application can be denied if (a) the applicant has a history of disruption and working against the purpose of the "forum" or (b) the applicant lies in his application. These are simply basic norms in any society that values order and

truthfulness. None of this runs afoul of the "unbridled discretion" doctrine, which (again) does not even apply in the present context.

Jarrard also challenged lack of a specific time limit to decide on an application. A decision was issued within roughly two weeks of Plaintiff submitting his 2020 application. That is plainly a reasonable time frame, and so there is no claim. Plaintiff's latest application, submitted solely to prevent his case from becoming moot, had no resolution for a longer time period because no jail ministry was ongoing.[9] Under these circumstances there was no First Amendment value or point in a time limit, and no harm from delay in a decision.

Last we come to "viewpoint discrimination." Plaintiff contends that his baptism doctrine is the real basis for denial of his volunteer application. It is not. Yet if Plaintiff's "baptism is necessary to salvation" doctrine really was the basis for denial, it falls into the broader category of an appropriate *content-based* restriction of messages that significantly agitate inmates and thus (1) tend to undercut inmate well-being and (2) unreasonably create problems for jail administrators.

_____

[9]    Defendants understand the necessity for standing that triggered the pending application and Plaintiff cannot be blamed for taking his counsel's reasonable advice. Yet it bears questioning whether a purely litigation-motivated application must seriously be regarded as legitimate when nothing material has changed from the last application except for adoption of a largely identical policy.

Defendants manifestly do not care what Plaintiff believes or teaches about baptism, and they are in favor of baptism for those who want it. Doc. 61 (Moats Dep.) at 26:2-6; Doc. 62 (Sharp Dep.) at 12. Yet reasonable jail administrators justifiably would favor preventing inmates from becoming highly agitated due to a volunteer minister telling the inmates they will go to Hell if they die without being full-immersion baptized, particularly when the jail policy did not allow that ritual for inmates.

Reasonable jail administrators would have the same institutional concerns about any of the following hypothetical messages to inmates propounded through the volunteer ministry program: (1) "persons who *are* baptized through full immersion *will* go to Hell"; (2) "persons with a tattoo(s) will go to Hell"; or (3) "persons who take medications will go to Hell." The list could go on. All of these are possible religious viewpoints that could be shared with inmates. All can reasonably be expected to produce the same negative results as Jarrard's "be baptized or go to Hell" message.

The point is that, even if Plaintiff's baptism doctrine is the reason for denial of the volunteer application (it is not), his particular *viewpoint* is not the issue. Plaintiff's "be baptized or go to Hell" doctrine is simply one of many problematic messages that do the same thing. The same problem arises from *any content* that is likely to agitate inmates unnecessarily, which in many respects defeats the

purpose of the jail ministry (or "forum" if Plaintiff's view is adopted). That is content-based restriction, not viewpoint restriction.

The government can limit content and speakers in a nonpublic forum using criteria that tend to further and/or preserve the basic purpose of the forum. *Cambridge Christian*, 942 F.3d at 1244; *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 49, 103 S. Ct. 948, 959 (1983) (finding that exclusion of messages from one union was reasonable to prevent inter-union controversy in the government space, and stating "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity."). A rule that prohibits messages and people likely to agitate inmates (as proven by a past experience) is eminently reasonable in a jail context.

In sum, even if this case is mistakenly analyzed under "forum" analysis and even if Jarrard's baptism doctrine is credited as the "real" reason for denial of his application, the District Court correctly granted summary judgment.

## V. THE DISTRICT COURT CORRECTLY HELD THAT QUALIFIED IMMUNITY PROTECTS DEFENDANTS

### A. General Qualified Immunity Standards

Qualified immunity standards in First Amendment retaliation cases are stated and applied in *Lane v. Franks*, 573 U.S. 228, 243, 134 S. Ct. 2369 (2014),

and *Echols v. Lawton*, 913 F.3d 1313, 1318 (11th Cir. 2019). There is no dispute that Defendants acted within their discretionary duties as jail administrators with regard to Plaintiff's ministry application and policy creation. Therefore, "the burden of persuasion [to defeat qualified immunity] is on the Plaintiff." *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997).

As discussed below, Plaintiff's claims do not involve a violation of clearly established law. To overcome qualified immunity, Plaintiff has the burden to show that "it would be clear to [Defendants] that [their] conduct was unlawful in the situation [each] confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156 (2001) (emphasis supplied). This requires proof that "existing precedent … placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 2089 (2012). Plaintiff has not met that burden.

The Supreme Court "repeatedly [has] told courts ... not to define clearly established law at a high level of generality." *Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S. Ct. 2012, 2023 (2014).

> The qualified immunity inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. An official's awareness of an abstract right does not equate to knowledge that his conduct may infringe that right.

*Gilmore v. Hodges*, 738 F.3d 266, 278 (11th Cir.2013) (citations omitted).

**B. Application of Qualified Immunity to Plaintiff's Claims**

**1. Qualified Immunity Bars the Retaliation Claim**

First, Defendants prevail because Plaintiff cannot establish a First Amendment retaliation claim under the tests outlined in Section I above. *See Boyce v. Andrew*, 510 F.3d 1333, 1347 (11th Cir. 2007). Second, "[i]t is particularly difficult to overcome the qualified immunity defense in the First Amendment context." *Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir. 2017) (collecting cases).

To elaborate, because the analysis of First Amendment public employment retaliation claims involves intensely fact-specific legal determinations, balancing tests and unsettled questions, "a defendant in a First Amendment suit will only rarely be on notice that his actions are unlawful." *Maggio v. Sipple*, 211 F.3d 1346, 1354 (11th Cir. 2000). "Because no bright-line standard exists to put the employer on notice of a constitutional violation, this circuit has recognized that a public employer is entitled to immunity from suit unless the *Pickering* balance 'would lead to the inevitable conclusion that the discharge of the employee was unlawful.' " *Busby v. City of Orlando*, 931 F.2d 764, 773-74 (11th Cir. 1991).

To illustrate this point, in *Lane v. Franks*, 573 U.S. 228, 134 S. Ct. 2369 (2014), the Supreme Court held that individual defendants were entitled to qualified immunity because no existing case law clearly prohibited a government

employer from firing an employee because of his testimony in a lawsuit. The Supreme Court framed the question with factual specificity in the following manner, which Defendants adjust to the facts of the present case:

> The relevant question for qualified immunity purposes is this: Could [Defendants] reasonably have believed, at the time [of the denial of Plaintiff's application], that a government employer could [reject a volunteer] on account of [a history of disruptive conduct or lack of candor in the volunteer application]?

*Lane v. Franks*, 573 U.S. 228, 243, 134 S. Ct. 2369, 2381 (2014) (alterations added).[10]

Here, there is no Eleventh Circuit precedent that answers the set of questions crucial to qualified immunity. See § I above; Doc. 75 at 34 (finding "The Eleventh Circuit has not resolved any of [the *Pickering*] issues in Plaintiff's favor."). If anything, the great weight of authority favors Defendants. Obviously the issues are at least debatable, and Plaintiff has the impossible burden to show that "existing precedent … placed the statutory or constitutional question **beyond debate**." *Reichle*, 156 U.S. at 664 (emphasis supplied). Plaintiff has not made the case that Sheriff Moats or Chief Sharp violated clearly established law by denying his volunteer application. Therefore, the District Court correctly

---

[10]    *Lane* found that qualified immunity barred liability because "Eleventh Circuit precedent did not preclude [the defendant] from reasonably holding that belief. And no decision of [the Supreme Court] was sufficiently clear to cast doubt on the controlling Eleventh Circuit precedent." *Id.*

dismissed Count 2 based on qualified immunity.

### 2. Qualified Immunity Bars Any Policy-Based Individual Claim

There is no clear Supreme Court or Eleventh Circuit case holding a policy and application process for service in a jail religious ministry program is subject to a "public forum" analysis or any of the related doctrines. In fact the great weight of authority says that the application process is governed by standards applicable to public employment. See § I; Doc. 75 at 38 ("Neither the Supreme Court nor the Eleventh Circuit has ever applied the unbridled-discretion doctrine on facts like these. And it is not clear they would.").

Consequently, Defendants could not have perceived that in crafting a volunteer ministry policy and application process they had to account for vague legal concepts like "overbreadth," "unbridled discretion" and so forth. The matter was not established "beyond debate" in Plaintiff's favor, and the District Court correctly held that qualified immunity bars Count 3.

## VI. THE DISTRICT COURT CORRECTLY REJECTED INJUNCTIVE RELIEF

Jarrard sought injunctive relief on counts 2 and 3. Aside from the merit-based reasons for dismissal detailed in prior sections, the district court correctly rejected injunctive relief for the following reasons. First, Jarrard abandoned his injunctive relief claims by failing to defend them against summary judgment.

Doc. 75 at 2 note 2.

Second, Chief Sharp is retired and so injunctive relief against him is moot. *Spomer v. Littleton*, 414 U.S. 514, 522, 94 S. Ct. 685, 690 (1974); *Ward v. Haskell*, No. 92-1868, 1993 U.S. App. LEXIS 4389, at *3 (6th Cir. 1993). Third, injunctive relief was not available on Count 2 because if Plaintiff prevails on a retaliatory volunteer denial claim then damages are an "an adequate remedy at law," precluding equitable relief. *Newman v. State of Ala.*, 683 F.2d 1312, 1319 (11th Cir.1982).

Fourth, admission to the Polk County jail ministry program is functionally a hiring decision that involves discretion by the Sheriff's Office, the same as any employment-type decision. Like employment, the relationship involves a commitment by the Sheriff's Office to deal with a given volunteer on a recurrent basis to conduct a program for the benefit of inmates. *Ex parte Young*, the only possible authority for injunctive relief against a State actor like the Sheriff, "cannot … be used to compel an executive official to undertake a discretionary task." *Montgomery v. Hugine*, No. 5:17-CV-1934-LCB, 2019 WL 2601545, at *6 (N.D. Ala. 2019) (citing *Seminole Tribe of Fla. v. State of Fla.*, 11 F.3d 1016, 1028-29 (11th Cir. 1994)); see *Ex parte Young*, 209 U.S. 123, 158, 28 S. Ct. 441, 453, 52 L.Ed. 714 (1908) ("There is no doubt that the court cannot control the exercise of the discretion of an officer."). There is no scenario under which it

would be appropriate for the District Court to remove the Sheriff's discretion by ordering him to admit Jarrard to the jail volunteer ministry program.

For all these reasons the District Court correctly dismissed Jarrard's injunctive relief claims.

## CONCLUSION

For the above and foregoing reasons, the Defendants respectfully submit that the District Court's summary judgment order should be affirmed to the extent it dismissed Jarrard's claims.

Respectfully submitted,

WILLIAMS & WAYMIRE, LLC

/s/   Jason Waymire
JASON WAYMIRE
Georgia Bar No. 742602
TERRY E. WILLIAMS
Georgia Bar No. 764330
Attorneys for Defendants

4330 South Lee St., NE
Building 400, Suite A
Buford, Ga 30518-3027
Telephone: (678) 541-0790
Facsimile: (678) 541-0789

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation set forth in

F.R.A.P. 32(a) (7) (B). This brief contains approximately 9,168 words, based on

a count by commercial software.

/s/    *Jason Waymire*

JASONWAYMIRE

Georgia Bar No. 742602

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of this **APPELLEES'**

**BRIEF** to all registered counsel through the Court's electronic filing system.

Participants in the case are registered CM/ECF users, and service will be

accomplished by the appellate CM/ECF system.

This 12 day of July, 2023.

WILLIAMS & WAYMIRE, LLC

/s/   *Jason Waymire*
JASONWAYMIRE
Georgia Bar No. 742602

4330 South Lee St., NE
Building 400, Suite A
Buford, Ga 30518-3027
Telephone: (678) 541-0790
Facsimile: (678) 541-0789